THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

K.C. COMPANY, INC.             :

                               :

     v.                        :    Civil Action No. DKC 20-0227

                               :

PELLA CORPORATION              :

                               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this contract dispute and fraud case between a former franchisee and its franchisor is Defendant's partial motion to dismiss. (ECF No. 25). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

**I.   Background**

Unless otherwise noted, the facts outlined here are set forth in the amended complaint and construed in the light most favorable to Plaintiff. Plaintiff K.C. Company, Inc. ("KCC") was a "family owned and operated" company founded in 1931 under Maryland law and with its principal place of business in Beltsville, Maryland. It operated as a "single-line regional distributor" and a franchisee of products produced by Defendant Pella Corporation ("Pella"), itself founded in 1925 under the laws of Iowa and with its principal business in Pella, Iowa. These products included

windows, patio doors, and entry door systems, which Pella sells
through showrooms and through distributors and franchisees that
comprise its "Direct Sale Network." KCC, as a franchisee,
distributed Pella products "on an exclusive basis" throughout the
Mid-Atlantic: Delaware, Maryland, West Virginia, Northern
Virginia, and Washington D.C. In addition to its headquarters and
warehouse in Beltsville, Plaintiff operated other Maryland
showrooms in Annapolis, Bethesda, Hunt Valley and in Falls Church,
Virginia. KCC's professional relationship with Pella dates back
to 1992 (at least), the date of their original distribution
agreement making it a franchisee. (ECF No. 25-2, at 2-5).[1] KCC
notes that, during this time, it was "frequently" recognized as a
"premier service partner" by Defendant and won "multiple" awards
for outstanding sale and service.

KCC's role as "exclusive regional distributor" was governed
by various agreements including a "Baltimore Distribution
Agreement," covering operations in Delaware, Maryland and
Virginia; a "Washington Distribution Agreement," covering
operations in Maryland, Virginia and West Virginia; and a "Sales

---

[1] A copy of this agreement was provided by Defendant and was
not attached to Plaintiff's complaint. It can be considered,
however, on a motion to dismiss as it is explicitly referenced and
relied on by Plaintiff in its complaint and "integral" to it. *See
Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705
(4th Cir. 2007)). The original agreement is signed under KCC's
former name "James A. Cassidy Company," as made clear in a 2003
addendum, also attached by Defendant. (ECF No. 25-2, at 6-9).

Branch Agreement" (collectively "the Agreements").   The Sales Branch Agreement stipulates that Pella and KCC had an "at-will" relationship: "Either party shall have the right to end the relationship, without liability to the other party, for any reason or for no reason, by giving the other party a written notice which provides that this Agreement shall expire."   (ECF No. 24-2, "TERMINATION OR EXPIRATION").   The expiration date could not be less than one year after the notice.   (ECF No. 24-2, at 5-6).

KCC alleges that, in or around 2015, Pella decided that it wanted to replace KCC and wanted to coerce it to leave the system. In 2016, Pella instructed KCC that it was required either to split its operations into two and to install a second headquarters to run its Washington D.C. and Virginia operations, or face termination under the Sales Branch Agreement.   KCC says it responded that division of its operations made no sense financially, so Pella countered with a third option: selling all its assets and rights to the mid-Atlantic region to a new purchaser, if, and only if, KCC agreed to terms and a schedule set by it.   "Faced with pressure" to choose one of these three options, Plaintiff says it opted to sell its business.

To facilitate the sale, the parties executed a "Sales Branch Transition Memorandum of Understanding" on May 13, 2016 ("the MOU").   KCC alleges that two Pella executives "represented, on behalf of Pella, that if Plaintiff did the things described in the

MOU, Pella would approve a sale of Plaintiff's assets including
the distribution rights associated with the Agreements." (ECF
No. 24, ¶ 23).  The document clearly announces itself as a "non-
binding transition memorandum," wherein the parties nonetheless
"pledge" their "best efforts." (ECF No. 24-3, at 2).  It sets out
a four-phase procedure that begins with retaining a sales broker
and centers around "Phase Three - Buyer Selection Process."  This
phase set a target date for selecting an "appropriate" buyer of
KCC's assets as December 31, 2016, and seems to place the onus on
KCC to "[s]ubmit the prospective buyer candidates to Pella for
approval" after conducting its own due diligence.  The MOU
memorializes Pella's long-term strategy of splitting KCC into two
— "KC North and KC South" — and notes that Pella would not approve
a single buyer for both regions and would require any buyer to
acknowledge "Pella's market optimization strategy (KC North –
Washington D.C. & Baltimore)"[2] in writing.  "Phase Four" set March
31, 2017, as a targeted close date on KC North, followed by the
start of the same process for KC South on July 1, 2017.  The final
section notes that both parties' rights and obligations under the

---

[2] The MOU does not otherwise define these regions.  Plaintiff
argues that it realized in hindsight that this entire plan to split
up operations was a pretext to force a sale, as it, like the other
stated criteria, entirely dropped from Pella's criteria for a buyer
once the sale was agreed on; ultimately, Pella "forced" KCC to
choose a buyer who would operate its former operations as a single
unit from its base in Michigan.  (*See* ECF No. 24, ¶ 71-72).

Agreements "continue in full force and effect." (ECF No. 24-3, at 2).

The amended complaint details conversations between the parties in which Pella expressed the need for "finding a buyer who understood distribution, who would be completely committed to growth, and who had the demonstrated ability to grow a market." Ultimately, Plaintiff secured Duffs & Phelps Securities, LLC ("Duff and Phelps") as the broker for the sale, in compliance with "Phase One," and as Pella's "preferred choice" among two other prospective brokers identified by KCC.

Duff and Phelps created a "confidential offering memorandum" to present to potential investors and by September 2016 it had contacted 48 "strategic buyers" and 113 "financial buyers" on Plaintiff's behalf. Twenty-seven of those prospects signed a nondisclosure agreement and received the offering memorandum. On October 27, 2016, after more due diligence, Duff & Phelps put forward Parksite, Inc. ("Parksite") as "a potential bona-fide purchaser," and Parksite returned a "non-binding indication of interest."

Plaintiff believed Parksite, a distributor of building supplies since 1971, was an ideal candidate for Pella with two existing Baltimore locations, which, it asserts, would "perfectly complement" KCC's "presence in the Washington DC and Northern Virginia markets." Plaintiff explains this "employee-owned

business . . . already was engaged in the distribution of construction products and specialty material in the region where Plaintiff operated" and had the "requisite experience in the sales, marketing, and distribution of building supply products."  It had also fostered "relationships" with companies on which Pella relied in "the installation process such as Dupont and its Tyvek product." Lastly, KCC explains, Parksite had demonstrated that it had the financial ability to grow its distribution network on Pella's behalf and without Pella's financial support.

On January 19, 2017, after further due diligence and negotiations by Duff & Phelps, Parksite submitted a letter of intent to purchase Plaintiff's business for $29,000,000.   On January 25, 2017, this letter was forwarded on to Pella "for consent and approval" and to begin the "vetting" process.

A day later, Pella rejected Parksite, despite allegedly having conducted no due diligence on the potential purchaser. David Smart and Annette Bravard, Pella executives, explained to KCC that Pella had rejected Parksite because it did not "meet our fundamental expectation of an owner/operator."   KCC argues that this was "clearly a pretexual rejection" as Parksite follows an employee stock ownership plan that is well-capitalized and so was "*exactly*" the kind of owner/operator that Pella sought.

After rejecting Parksite, Pella recommended that Plaintiff engage candidates outside the "Mid-Atlantic area" and those

previously known to it, and "threatened to terminate Plaintiff if a buyer was not found by March 31, 2017," the closing date on the MOU.   Among those rejected, however, was a buyer that "included Plaintiff's then existing management team and an existing Pella distributor in Richmond, Virginia."   From that point forward, KCC asserts, Pella *only* entertained buyers it proposed, even though KCC had committed to pay Duff & Phelps a commission, regardless. "Accordingly, Plaintiff stopped taking offers from candidates located by Duff & Phelps and, instead, began meeting with candidates presented by Pella."   Despite Pella's stated search criteria, moreover, the entities that Pella subsequently pushed as prospective buyers were not owner/operators "but rather remotely-owned entities that would, by necessity, operate through delegates."

Ultimately, Pella introduced Plaintiff to John Estabrook, owner of Pella Mid-Atlantic, Inc ("Pella Mid-Atlantic"), a Michigan based corporation "formed for the specific purpose" of buying Plaintiff.   Pella Mid-Atlantic put forward a letter of intent to buy KCC for $20,000,000.   KCC asserts that Pella took over as agent in the "ensuing negotiations" with the prospective buyer; discussions over price "were not between Plaintiff and Pella Mid-Atlantic, but instead were between Plaintiff and Pella through Mr. Smart."   Pella Mid-Atlantic was also under-capitalized and

required funding from Pella to close the deal, which created a perverse incentive for it to drive the price down, KCC argues.

KCC tried to intervene "to get a price more in line with the fair market value of its assets" and says that Pella threatened it with termination "if it did not immediately stop negotiating and simply accept the $20 million offered by Pella Mid-Atlantic." Acquiescing to this pressure,[3] it accepted the Pella Mid-Atlantic offer, "rather than risk having the value of its business gutted by this bad faith conduct." An "Asset Purchase Agreement" between Plaintiff and Pella Mid-Atlantic closed on August 31, 2018.

KCC brings three causes of action against Pella: 1) breach of contract, citing a breach of both the Agreements and the MOU; and two tort claims: 2) fraudulent inducement, and 3) negligent misrepresentation, both based on the MOU and related promises allegedly made by Pella and relied on by Plaintiff. (ECF No. 24).[4] On August 25, 2020, Pella filed a partial motion to dismiss both the negligent misrepresentation and fraud claims in that "KCC has failed to properly allege an actual misrepresentation or that it

---

[3] Plaintiff asserts that when KCC's President Kevin Cassidy attempted to insist on a higher price, Ms. Bravard demanded his location, so she could give him immediate notice of KCC's termination as a distributor in person.

[4] The original complaint, filed on January 24, 2020, contained only two causes of action (ECF No. 1), but Plaintiff amended its complaint, by right, on May 19, thus mooting an earlier motion to dismiss.

justifiably relied on Pella's misrepresentation." The motion also argues that the negligent misrepresentation claim independently fails in that "KCC has not alleged that Pella owed it a duty sufficient to sustain that claim." (ECF No. 25); (*see* ECF No. 25-1, at 9). KCC filed its opposition to the motion on September 25 (ECF No. 30), and Pella replied on October 16. (ECF No. 33).

## II.  **Standard of Review**

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III. Analysis

Although the first count, breach of contract, is not at issue in the motion to dismiss, counts two and three cannot properly be analyzed except in context.  Count one alleges that the Agreements **and MOU** were valid and existing contracts between the parties at all operative times.[5]  KCC alleges that Pella breached its implied covenant of good faith and fair dealing by improperly interfering in the sales process and failing in good faith to consider any potential buyers submitted by KCC to Pella.  It goes on to assert that the immediate rejection of Parksite without conducting any due diligence was unreasonable and a breach of the Agreements **and MOU**.  KCC seeks damages of at least $9,000,000, the difference between the Parksite offer and that of Pella Mid-Atlantic.  In counts two and three, KCC seeks damages in the form of expenses, including the commission paid to the broker, incurred during the attempt to procure a buyer or buyers.  It alleges that representations made in the **MOU** and ancillary discussions induced it to engage the broker when Pella had no intention to participate in the process in good faith.

---

[5] Plaintiff inconsistently insists in its response to the motion that it is not seeking to enforce the MOU and is not asserting a claim for breach of the MOU.  (ECF No. 30, at 8 & n.3).  A party may not amend a complaint in this fashion.

### A.    Fraudulent Inducement

Plaintiff asserts that it entered the MOU in "good faith" in 2016 and "based on the threat that absent compliance with these parameters Pella would not allow the assignment of Plaintiff's distributions rights to any proposed buyer, thereby eviscerating the value of the assets."  KCC agreed to move forward on a sale despite this coercive aspect because "Mr. Smart and Ms. Bravard made it clear on behalf of Pella that if Plaintiff performed in accordance with terms of the MOU, Pella would likewise perform its obligations thereunder in good faith."  KCC argues that Pella's subsequent conduct reveals that Pella had no intention of acting in good faith or honoring the MOU, even at the time it was executed. (ECF No. 24, ¶¶ 76, 77).

For example, Plaintiff points out that Parksite was rejected on January 26, 2017, by letter, less than twenty-four hours after it was presented as a potential buyer.  Earlier that day, just prior to this decision, Charlie Maskell, one of Plaintiff's outside directors, Mr. Smart, and Ms. Bravard participated in a telephone call in which KCC was informed "that Parksite did not meet Pella's profile solely" because it was not "a local owner/operator."  KCC purports to have "used the January 26, 2017 call as an opportunity to inform Pella that Parksite was in fact owner-operated and present in the local market at issue."  Ms. Bravard allegedly countered that Parksite was headquartered in Illinois and thus was

11

not "in region" and reiterated Pella's expectation that Plaintiff would nevertheless be expected to meet the March 31 deadline. (*Id.*, ¶¶ 84-87).[6]   Mr. Cassidy reached out via email to address these comments but was met with the same criticism by Ms. Bravard. The next day, Mr. Cassidy reached out to Pella's CEO Tim Yaggi via email to talk more about the rejected buyer; while Mr. Yaggi expressed a willingness to talk on the phone, he said he understood Parksite "does not fit [Pella's] owner-operator model."   (*Id.*, ¶ 90).

Although KCC does not clearly detail how many buyers it put forth in earnest after Parksite, it reports that "A buyer was not approved by the March 31, 2017."   By that time, it says it became clear that "only Pella's preferred or 'approved' candidates . . . would be considered."   Instead, "during the following months discussions ensued with Pella's preferred candidates – none of which were in the region." (*Id.*, ¶ 91).

On September 14, 2017, in a continuing effort to close a sale, Mr. Maskell reached out on KCC's behalf to Mr. Smart, Ms. Bravard and another Pella employee named Paul Parks.   He presented a PowerPoint that included a plan for Plaintiff smoothly to transition to new ownership and to ensure proposed buyers "would

---

[6] She is alleged to have said, "Tell Kevin that he should probably stay home from Miami, and we are ok with that, and work on selling his company by March 31."

all be fairly evaluated." Mr. Smart responded by email reiterating its stated reasons for rejecting Parksite and twice highlighting an "Andrew 'Andy' Andress" as a potential buyer, who Plaintiff asserts is not a local owner-operator as he resides in Lake Forest, Illinois. Nevertheless, Mr. Smart allegedly stated his intent for Pella *not* to be involved in negotiations with potential buyers of KCC, even though he was the Pella agent who ultimately took an active role in the negotiations between Plaintiff and Pella Mid-Atlantic. (*Id.*, ¶¶ 92-97).

As a result, Plaintiff argues, it "relied on the false when made representations of Pella that were made in the MOU and that were otherwise made by Pella to Plaintiff both orally and in writing." It was "in reliance" on these alleged misrepresentations that Plaintiff says it entered into a contract with Duff & Phelps that required it to pay a $600,000 commission to it as a broker at the close of the sale to Pella Mid-Atlantic. But for this reliance, it argues it would not have incurred this additional cost "as well as substantial attorneys' fees and other disbursements during the process contemplated under the MOU." KCC argues that Pella knew these representations were false when made and made them "solely for the purpose of fraudulently inducing Plaintiff to enter into the MOU, notwithstanding Pella's unstated plan to force a sale by Plaintiff to a company of Pella's choice on terms beneficial only to Pella." (*Id.*, ¶¶ 98-99). It demands

13

a judgment in the amount of $600,000 plus interest, attorneys'
fees and any costs it incurred in performing the MOU on the fraud
and negligent misrepresentation counts.

Fraud is held to a heightened pleading standard:

> Rule 9(b) states that "in alleging a fraud or
> mistake, a party must state with particularity
> the circumstances constituting the fraud or
> mistake. Malice, intent, knowledge, and other
> conditions of a person's mind may be alleged
> generally." Such allegations typically
> "include the 'time, place and contents of the
> false representation, as well as the identity
> of the person making the misrepresentation and
> what [was] obtained thereby.'" . . . . The
> purposes of Rule 9(b) are to provide the
> defendant with sufficient notice of the basis
> for the plaintiff's claim, to protect the
> defendant against frivolous suits, to
> eliminate fraud actions where all of the facts
> are learned only after discovery, and to
> safeguard the defendant's reputation. In
> keeping with these objectives, "[a] court
> should hesitate to dismiss a complaint under
> Rule 9(b) if the court is satisfied (1) that
> the defendant[s were] made aware of the
> particular circumstances for which [they] will
> have to prepare a defense at trial and (2)
> that [the] plaintiff has substantial
> prediscovery evidence of those facts."

*Grant v. Shapiro & Burson, LLP*, 871 F.Supp.2d 462, 468 (D.Md. 2012)
(citations omitted) (quoting *Superior Bank, F.S.B. v. Tandem Nat'l
Mortg., Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000)).

Judge Hollander has explained how a fraud claim encompasses
different forms of illegal conduct:

> Under Maryland law, "'[f]raud encompasses,
> among other things, theories of fraudulent
> misrepresentation, fraudulent concealment,

14

and fraudulent inducement.'"   *Sass    v.*
*Andrew*, 152 Md.App. 406, 432, 832 A.2d 247,
261 (2003) (citation omitted).   In other
words, "fraudulent inducement is   simply   a
means of committing fraud." *Id.,* 832 A.2d at
261–62. In Maryland, to prevail on a fraud
claim, a plaintiff must show:

> (1) that the defendant made a false
> representation   to   the   plaintiff,
> (2) that its falsity was either
> known to the defendant or that the
> representation    was    made    with
> reckless indifference as   to   its
> truth,    (3)    that    the
> misrepresentation was made for the
> purpose   of   defrauding   the
> plaintiff, (4) that the plaintiff
> relied on the misrepresentation and
> had the right to rely on it, and (5)
> that    the    plaintiff    suffered
> compensable injury resulting from
> the misrepresentation.

*View Point Med. Sys., LLC v. Athena Health, Inc*., 9 F.Supp.3d 588

(quoting *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.,* 398 Md.

529, 544 (2007) (quotation marks and citation omitted) and

collecting other Court of Appeals cases).

Pella contends that the alleged misrepresentations fail to

state an actionable tort, either because they contradict

contractual provisions, constitute only aspirational statements,

lack factual support, or defy common sense.

### 1.   Reasonable Reliance

Defendant first argues that Plaintiff had no right to rely on

any alleged promise that Pella would approve a sale if KCC complied

with the MOU, as such a promise "contradicts the parties' express

contractual rights." (ECF No. 25-1, at 10).  The Agreements make clear that Pella's approval was necessary for any sale of distribution rights and Pella promised that such consent would not be "unreasonably withheld." (*See* ECF Nos. 24-2 "Sales Branch Agreement," at 5 and 25-2, "[Baltimore] Distributor Agreement" at 4).  Pella is correct that "[a] person cannot reasonably believe in the full truth of an alleged misrepresentation that directly contradicts the terms of a contract to which the person is a signatory." *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F.Supp.2d 505, 537 (D.Md. 2011) (citing *James v. Goldberg*, 256 Md. 520, 529-30 (1970)).

KCC makes only vague allegations of the purported misrepresentations.  The alleged promises contained in the MOU cannot both be contractually binding and form the basis of fraud, but a party is entitled to plead in the alternative.  Thus, assuming that the MOU was not an enforceable contract, Plaintiff appears to be asserting that the MOU and associated discussions contained representations by Pella.  The MOU only states that "both parties pledge to use their best efforts to successfully transition the KC North & South businesses according to the timelines outlined below."  The obligations and rights of the existing agreements were to continue in full force.  Beyond that, there are no representations by Pella contained in the MOU.  Thus, nothing in the MOU itself contradicts the Agreements.

Plaintiff also points to oral representations made during the negotiations leading up to the MOU.  Pella executives purportedly said an acceptable buyer would be one who "understood distribution, who would be completely committed to growth, and who had the demonstrated ability to grow a market."  Any description of the kind of purchaser that would meet Pella's expectations does not contradict the Agreements.  The MOU was created expressly to govern and set expectations for KCC's sale of assets to a buyer approved by Pella, whose consent would not unreasonably be withheld.

Plaintiff, however, additionally argues that the Pella agents promised that if the MOU was followed, Pella would approve the sale.  Such a statement cannot be reasonably relied on by KCC as it is both directly contradicted by the Agreements and the MOU itself.  The former make clear that Pella could withhold consent unless doing so was "unreasonable," and the latter instructs KCC to "[s]ubmit the prospective buyer candidates to Pella for approval," thus reinforcing that Pella had the ultimate discretion to approve or reject a buyer.  *See Enfield Equip. Co., Inc. v. John Deere Co.*, 64 F.Supp.2d 483, 487 (D.Md. 1999) (oral promises steering the plaintiff toward a particular buyer for its business could not reasonably be relied upon when the plaintiff retained a responsibility to do independent due diligence and the defendant retained the ultimate right of approval over any sale); *cf Meerkreebs v. Astor & Sanders Corp.*, No.: PWG-17-695, 2018 WL

17

1211539, at *1, *5-*6 (D.Md. March 7, 2018) (relied on by the plaintiff and finding that an offer letter stating employment was "at-will" did not contradict the specific terms of employment promised to a new hire during his interview).

The remaining alleged misrepresentations nevertheless fail to form the proper basis of a fraud claim given that they are simply too vague or aspirational reasonably to be relied on, as Pella argues. (ECF No. 25-1, at 15). The parties' "best efforts" pledge in the MOU is simply a reiteration of Pella's contractual obligation to not "unreasonably" withhold consent to a sale. Defendant is correct that "[t]he mere failure of promised performance does not, in and of itself, convert a breach of contract claim into a claim for fraud." *Metro Ready Mix, Inc. v. Essroc Cement Corp*., No. CCB-06-0538, 2007 WL 1306595 (D.Md. Apr. 25, 2007) (citing *Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 495 (D.Md. 2002)). Moreover, such "optimistic" promises, Pella rights asserts, cannot form the basis of actionable fraud. *See Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md.App. 403, 452 (2012) (quoting *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md.App. 97, 136 (2003)) (discussing how in that case "the defendant's other 'representations [were] so broad and vague that they are not actionable misrepresentations, and fall within the category of 'puffing.'"). These alleged misrepresentations, collectively, lack the kind of "particularity required by Rule 9(b)." (ECF

No. 25-1, at 9).  The fraud claim will be dismissed and leave to amend will not be granted, not because KCC has already amended its complaint once as Defendant argues (ECF No. 33, 3 & n.1), but because to do so would be futile.  Fed.R.Civ.P. 15(a).  Such amendment would not survive a motion to dismiss as the plaintiff cannot argue plausibly that any of these representations were false when made.[7]

### 2.   False When Made

Defendant argues that the statements were not false when made and therefore cannot show the required intentionality on its part. (ECF No. 25-1, at 12-13).  The Court of Special Appeals of Maryland has stated, "A fraudulent pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the promise alone." *Dynacorp*, 208 Md.App. at 453 (quoting *First Union* 154 Md.App. at 149 (2003)).  Defendant concedes that *Dynacorp* itself establishes that this rule is not without exception:

> under certain conditions, a failure or refusal
> to perform is strong evidence of an intent not
> to perform the promise at the time it was made,

---

[7] Plaintiff implies that Defendant has cherry-picked the "three misrepresentations noted in the Motion," while ignoring others (ECF No. 30, at 9), but nowhere does the amended complaint itself clearly delineate the various alleged misrepresentations or, how, but for such representations, it would have acted differently. (*See* ECF No. 25-1) (citing *Dynacorp*, 208 Md.App. at 464). Ultimately, Plaintiff's allegations boil down to an argument that KCC agreed to pursue a sale only because it was falsely induced to believe it would be treated fairly in the process.  As mentioned, however, the Agreements explicitly already promised as much.

> as where only a short period of time elapses
> between the making of the promise and the
> failure or refusal to perform it, and there is
> no change in the circumstances.

*Id.* (emphasis removed).

Discussing fraudulent intent in both fraud and negligent misrepresentation claims and in the context of the parol evidence rule, Magistrate Judge Coulson wrote, "Fraudulent intent may be inferred from: (1) the situation of the parties; (2) the activity of the promisor in procuring the transaction; (3) a short time period between the promise and the failure to perform; and (4) the promisor's subsequent conduct." *Price v. Berman's Automotive, Inc.*, No. 14-763-JMC, 2015 WL 5720429, at *4 (D.Md. Sept. 28, 2015) (finding a reasonable fact finder could conclude the defendant had the requisite intent to allow the consideration of prior, oral promises allegedly inconsistent with a written agreement as part of plaintiff's fraud claim) (citing *Sagent Tech., Inc. v. Micros Sys., Inc.,* 276 F.Supp.2d 464, 468 (D.Md. 2003) and *First Union*, 154 Md.App. at 156-57). Such considerations are equally applicable to this context.

Defendant argues that it is implausible that its rejection of Parksite, occurring in late January 2017, is sufficient evidence that Pella never intended to honor the MOU or that it lied when it expressed vague, aspirational attributes of an ideal buyer in spring of 2016, almost a year prior. It is even more implausible

to allege that the close of the sale on Pella Mid-Atlantic, which purportedly fulfilled none of its agents' sought-after criteria, on August 31, 2018 (more than two years after the alleged misrepresentations), is further evidence that these promises were false when made.  (ECF No. 25-1, at 14-15).  More than a "short time" has elapsed between the promise and an alleged failure to perform it.  *See Dynacorp*, 208 Md.App. at 453.  To argue that Pella engaged in "a years-long scheme to eventually force a sale to Pella's 'hand-picked buyer'" when it simply could have given KCC notice of termination and installed its own buyer is, as Pella explains, "the height of *im*plausibility."  (ECF No. 33, at 3).  "By not doing so, KCC was able to capture value from the sale of an otherwise terminable right."  (ECF No. 25-1, at 3).[8]  Looking to Judge Coulson's factors, neither the "situation" of the parties prior to agreeing on the MOU and eventual sale of KCC's business, nor Pella's actions before or after the MOU was executed and Duff & Phelps was engaged, plausibly suggest the required fraudulent

---

[8] KCC concedes as much in its amended complaint: "In fear of being terminated by Pella if it did not acquiesce to Pella's demands to accept a handpicked buyer at a below market price, Plaintiff accepted the Pella Mid-Atlantic offer rather than risk having the value of its business gutted by this bad faith conduct." (ECF No. 24, ¶ 58).  The amended complaint also highlights Pella's threat of termination, after rejecting Parksiste, if KCC did not find a buyer by the MOU's closing date.  (*Id.*, ¶ 44).  Such allegations highlight the deficiency of the complaint because they suggest that the parties' contractual right to terminate (with one-year notice) was what induced Plaintiff to acquiesce to Pella's various demands as to the sale, not any of its representations.

intent is present here, even if Plaintiff were to plead the alleged false statements with more particularity.  The fraud claim will be dismissed with prejudice.

### B.   Negligent Misrepresentation

As with its other claims, KCC incorporates its earlier allegations into this claim.  It reiterates that "At all times relevant to this action, the Parties were subject to the Agreements . . . and the MOU."  KCC argues that Pella owed it a "duty of care" to disclose that it was, in fact, not willing to abide by the terms of the MOU.  This duty arose, it argues, not only from their prior agreements, but also "the many years that Plaintiff and Pella maintained a close, manufacturer-distributor relationship," and the "many months-long detailed business negotiations" that aimed "to terminate this relationship on a good faith, mutually beneficial basis."  Contrary to Pella's representation that it would strive to effectuate such an end to their partnership, it "instead intended solely to force a sale by Plaintiff to a company of Pella's choice on terms beneficial only to Pella."  As in the previous claim, Plaintiff argues that "Pella knew that Plaintiff would rely on this misinformation because Pella forced Plaintiff into the sale of its business and forced Plaintiff into the MOU." (*Compare* ECF No. 24, ¶ 110 *with* ¶ 77).  Nevertheless, Plaintiff argues that it was justified in assuming that the terms of the MOU would be respected and that the sale would occur on mutually

beneficial terms.   The prayer for relief, like the fraud claim, seeks damages in the form of the costs of performing the MOU, primarily the commission paid to Duff & Phelps, "in an amount of not less than $600,000." (*Id.*, ¶¶ 102-113).

The Court of Appeals of Maryland has set out the five elements of a negligent misrepresentation claim:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
>
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
>
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Griesi Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11 (2000) (quoting *Weisman v. Connors*, 312 Md. 428, 444 (1988)); *see also N. Gilmor, LLC v. Cap. One, Nat. Ass'n*, 863 F.Supp.2d 480, 490 (D.Md. 2012) (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135-36 (2007)).   Like a fraud claim, "a 'negligent misrepresentation claim based on statements promissory or predictive in nature' is not viable '[u]nless the plaintiff puts forward evidence tending to show that the promisor or predictor made the statements with the present intention not to perform.'"   *N. Gilmor*, 863 F.Supp.2d at 493

(quoting *Miller v. Fairchild Indus., Inc.*, 97 Md.App. 324, 246 (1993)).

The parties disagree on whether the heightened pleading requirements of Fed.R.Civ.P. 9(b) should apply to the negligent misrepresentation claim as well.  Plaintiff is correct that normally it does not.  (ECF No. 30, at 18) (citing *Kane v. Zimmer Biomet Holdings, Inc.*, No. RDB-17-2268, 2018 WL 4005216, at *3 (D.Md. Aug. 22, 2018) (itself quoting *Balt. Cty. v. Cigna Healthcare*, 238 F.App'x 914, 921 (4ᵗʰ Cir. 2007)) ("Importantly, a claim of negligent misrepresentation under Maryland law does not contain an essential showing of fraud and thus the heightened pleading requirements of Rule 9(b) do not apply.").  Citing to this same case for the general rule, Judge Gallagher explained it is not without exception:

> Claims for negligent misrepresentation are not typically subject to the heightened pleading standards in Fed. R. Civ. P. 9(b).  However [the plaintiff's] count, nominally entitled "Negligent Misrepresentation," does not allege any of the customary elements of negligent misrepresentation, and instead clearly alleges intentional deception. Because Plaintiff's allegations sound in intentional fraud, not negligence, the heightened pleading standard in Rule 9(b) would apply . . . .

*Rosedale v. CarChex, LLC*, No. SAG-19-2780, 2020 WL 998740, at *6 n.3 (D.Md. Mar. 2, 2020) (citations omitted) (citing *Cigna Healthcare*, 238 Fed.Appx. at 921).  Similarly, despite KCC's

insistence that Pella owed it an independent duty of care because of their long working relationship together, Plaintiff's allegations clearly center around purported intentional fraud, not negligence, and so are subject to the higher pleading standard.

Because of the extensive overlap between these two causes of action, Defendant treats Plaintiff's negligent misrepresentation claim as synonymous with its fraud claim throughout most of its motion; it argues that KCC fails sufficiently to plead "an actual misrepresentation" or justifiable reliance as to either claim. (ECF No. 25-1, at 9). As before, to argue that Pella never intended to abide by the MOU is only to say it never intended to use its "best efforts," and so is merely an attempt to add fraudulent intent, which is not properly supported by the allegations, to a breach of contract claim. Further, Plaintiff again highlights that Pella forced it into both the MOU and the sale itself, presumably through its threats of termination. It is entirely unclear how Pella's threatened use of a contractual right to pressure a sale meant it knew these other non-contractual representations were false or would be relied upon by Plaintiff when hiring Duff & Phelps (or otherwise). This claim fails for these and the reasons stated above; Plaintiff has failed to plead sufficiently that such representations were false when made or that Plaintiff justifiably relied on them. Therefore, Pella's argument that the negligent misrepresentation independently fails

— asserting Plaintiff cannot establish an extra-contractual duty of care — need not be addressed.  (*See* ECF No. 25-1, at 17).  This claim will be dismissed with prejudice as well.

## IV.  Conclusion

For the foregoing reasons, the partial motion to dismiss filed by Defendant will be granted.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
