IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

K.C. COMPANY, INC., et al.      :

                             :

    v.                       :   Civil Action No. DKC 20-0227

                             :

PELLA CORPORATION         :

                             :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this contract dispute between a former franchisee and its franchisor is the motion for summary judgment filed by Defendant Pella Corporation, (ECF No. 46), and interim motions to seal filed by both parties, (ECF Nos. 48 and 51).  The issues have been briefed, and the court now rules, no hearing being necessary.  Local Rule 105.6.  For the following reasons, all the motions will be granted.

**I.  Background**

Unless otherwise noted, the following facts are undisputed. Defendant Pella Corporation ("Pella") designs and manufactures windows and doors for residential and commercial buildings.  (ECF No. 46-4, at ¶¶5-6).  Plaintiff K.C. Company, Inc. ("KCC") is a former franchisee or distributor of Pella's products.  When KCC tried to sell its distribution rights to another company, Pella refused to give its consent to the sale.  KCC eventually sued Pella for breach of contract.  Now at summary judgment, the parties

dispute whether Pella reasonably withheld its consent to the transfer, and whether KCC has developed evidence that it suffered damages.

Pella sells its products through four "channels." (*Id.* at ¶7). One channel is the "Pella Direct Sales Network" ("PDSN"). Sellers in this channel exclusively or almost exclusively sell Pella products. (ECF No. 47, at ¶34). Another channel is the "Pella Pro-Dealer Channel." Pro Dealer sellers often sell the products of multiple manufacturers. (ECF No. 46-4, at ¶11).

KCC, for decades, was a franchisee of Pella, operating as a PDSN distributor in a territory covering the Washington, D.C., and Baltimore, Maryland, metropolitan areas.[1]  The vast majority of KCC's business was distributing Pella products. (ECF No. 46-8, at 41). KCC serviced its territory from a headquarters and warehouse in Beltsville, Maryland.  It also operated four showrooms in Maryland and Virginia.

Pella and KCC operated according to two sets of distribution contracts, the "Trade Agreements," (ECF Nos. 46-9 and 46-10), and the "Sales Branch Agreements," (ECF Nos. 46-11 and 46-12). Together, these contracts gave KCC distribution rights for Pella

---

[1] KCC also has a distribution region covering Louisiana and Alabama.  The Washington-Baltimore region was sometimes referred to as "KCC North," and the Louisiana-Alabama region as "KCC South." (ECF No. 46-6, at 4).  This case only concerns the KCC North region and references to KCC's business only refer to the KCC North region.

products in the Washington and Baltimore regions.  The parties agree that KCC's distributorship was collectively governed by these agreements.  Under the Trade Agreements, KCC could not "sell, transfer or assign to any prospective purchaser of his business, his right to purchase Pella Products or operate as a Pella Products Distributor without securing prior written consent" from Pella. (ECF Nos. 46-9, at 4; 46-10, at 4).  Pella contracted that its consent would not be "unreasonably withheld."  (*Id.*)  Pella, however, reserved the "right to accept a replacement Distributor based upon its marketing needs, as well as the financial, sales and service ability of the new Distributor." (*Id.*).  Either party could terminate the Trade Agreement with one year's written notice. (*Id.*).

The Sales Branch Agreements similarly required KCC to obtain Pella's consent prior to a sale, transfer, or assignment of KCC's distribution rights.  (ECF Nos. 46-11, at 5-6; 46-12, at 5-6). Again, Pella contracted that its consent would not be "unreasonably withheld."  (ECF Nos. 46-11, at 6; 46-12, at 6).  Pella reserved the right to accept or reject a proposed replacement based on

> its marketing needs, as well as the financial
> and other qualifications of the sales branch
> candidate, the business plans proposed by the
> sales branch candidate, and such other factors
> as Pella, in exercise of its business
> judgment, determines are relevant to the long-
> term needs and business interest of its
> business.

(*Id.*).  References to Pella's "business judgment" were "intended to establish a standard under which such judgment is subject to review in order to determine whether it reflects a business judgment exercised with a reasonable basis and not as a matter of pretext." (*Id.* at 8).  The Sales Branch Agreements were similarly terminable for any reason or no reason with one year's notice. (*Id.* at 6).  The Sales Branch Agreements provide they will be "governed and construed in accordance with the laws of the State of Iowa without regard to its choice of laws provisions." (*Id.* at 11).

### A. PDSN and Pro Dealer Sellers

Of the four channels through which Pella sells its products, two are relevant in this case: the PDSN channel and the Pro Dealer channel.  The channels, and the sellers operating within them, operated and were managed by Pella in different ways.  (ECF No. 46-6, at 24).  PDSN sellers only sold Pella products.  Pro Dealer sellers, however, sold products from multiple manufacturers.  The types of services offered by sellers also differed.  PDSN sellers provided "value-add engineering," becoming experts on a specific home and the windows and doors needed for it.  (ECF No. 46-6, at 22).  Pro Dealer sellers, however, often sold bundles of building products, such as roofing, decking, fencing, and windows, to

builders.[2]  PDSN sellers also had the unique right of first refusal to provide service on any Pella product in their region, irrespective of the original seller.  For example, if a Pro Dealer sold a Pella window, it was the PDSN seller in that region who had first right of refusal to provide any service needed on the window. Pella believes this gives PDSN sellers an advantage in building their customer set.  (ECF No. 46-6, at 24-25).  PDSN sellers are also "owner/operators," whose owners have individual leadership with their own capital invested in the business, whereas most of Pella's Pro Dealers tend to have a corporate structure.  (ECF No. 46-6, at 25-26).

Pella was, and is, concerned about managing "channel conflicts," a "term used to characterize the disagreements between and among a supplier and its resellers."  (ECF No. 47, at ¶19). Channel conflicts can take different forms, including conflict between the supplier and reseller within a given channel; a conflict among members of a given channel; or conflict among the supplier, members of the existing in channel, and a reseller comprising a different channel.  (ECF No. 47, at ¶19). Manufacturers and sellers generally have competing desires. Manufacturers prefer wide distribution networks with many

---

[2] As explained in footnote 8, the parties dispute whether a Pella slide deck states that Pro Dealer sellers bundled products more or less than PDSN sellers.  This dispute is ultimately not material.

competing resellers who are focused on the manufacturer's product. One way to achieve that focus is to have resellers that do not sell directly competing products.  Resellers, on the other hand, prefer exclusive territories without direct competition and the ability to sell a selection of goods and services.  (ECF No. 47, at ¶19).  When manufacturers are using two or more distinct channels, the channels may operate in different ways.  The differences may result in different marketing structures with different margins.  Moreover, services that may be needed in one channel may not be required in another.  (ECF No. 47, at ¶23). Pella believes that, because its four channels provide different services and purchasing environments to different types of customers with different preferences, its distribution system is set up to avoid significant conflict between channels.  (ECF Nos. 46-4, at ¶13; 47, at ¶¶31 and 43).

**B. Pella's Decision to Require KCC to Break Up its Washington-Baltimore Business**

In 2014 and 2015, Pella began designing and developing a new marketing plan called the "Top-100 Strategy."  (ECF Nos. 46-6, at 4; 46-8, at 11).[3]  The goal was to acquire greater market shares

---

[3] In a document attached to its opposition, KCC addresses, fact by fact, whether it disputes Pella's statement of undisputed facts.  (49-3).  The document also recites objections to some of the bases for the facts.  One such pairing of objections is "Lack of foundation; hearsay," to several of Pella's facts regarding the Top-100 Strategy.  KCC never explains why such evidence, in this case deposition testimony from a Pella officer about Pella's

in the top 100 metropolitan statistical areas across the country.
Washington, D.C., and Baltimore are separate metropolitan
statistical areas, and both are among the top 100. (ECF No. 46-
6, at 7-8). Pella analyzed data and determined that when a
distributor was servicing multiple metropolitan statistical areas,
the metropolitan area in which the distributor's headquarters was
located had a higher market share than the other areas. (*Id.* at
6-7). KCC's headquarters was in Beltsville, Maryland, within the
DC metropolitan statistical area. (*Id.* at 7-8). Thus, in August
of 2015, Pella asked KCC to split up its Washington and Baltimore
markets and sell one of them to a new owner.[4] (ECF Nos. 46-16, at

---

business plans and strategies, should be excluded for lack of
foundation or as hearsay. KCC does not dispute the facts.
Instead, it says it does not dispute the facts because the factual
assertions are "pure speculation." (ECF No. 49-3, at 10). Since
the amendment to Fed.R.Civ.P 56 in 2010, however,

> facts in support of or opposition to a motion
> for summary judgment need not *be* in admissible
> form; the requirement is that the party
> identify facts that could be put in admissible
> form. *See Niagara Transformer Corp. v.*
> *Baldwin Techs., Inc.*, No. DKC-11-3415, 2013 WL
> 2919705, at *1 n.1 (D.Md. June 12, 2013)
> ("Importantly, 'the objection [now]
> contemplated by the amended Rule is not that
> the material has not been submitted in
> admissible form, but that it cannot be.'"
> (quoting *Ridgell v. Astrue*, No. DKC-10-3280,
> 2012 WL 707008, at *9 (D.Md. March 2, 2012))).

*Wake v. Nat'l R.R. Passenger, Corp.*, No. 12-cv-1510-PWG, 2013 WL
5423978, at *1 (D.Md. 26, 2013) (emphasis in original).

2; 46-8, at 15-16).  Pella also asked for greater investment in the Baltimore region in the form of a new management team and a new operating facility for inventory and logistical support.  (ECF No. 49-1, at ¶4).  Pella's hope and goal was that independent ownership would result in greater market penetration in Baltimore. (ECF No. 46-6, at 8).

Kevin Cassidy, KCC's president and owner, did not want to split up Washington and Baltimore, but he also did not believe the Top 100 Strategy was being pursued with "malintent."  (ECF No. 46-8, at 16, 18).  Initially, Mr. Cassidy responded to Pella's request by offering to sell the entirety of KCC's business when he retired within three years.  He had already been planning on retiring and possibly selling the business within three to five years.  (ECF No. 46-13, at 2).  In the meantime, he told Pella he would expand KCC's facilities and operations in Baltimore.  Pella, however, insisted that three years would be too long.  (ECF No. 50-1, at 2).  Ultimately, Charlie Maskell, a member of KCC's advisory board who Mr. Cassidy designated to act on behalf of KCC and Mr. Cassidy throughout the sale process, proposed in April of 2016 that Pella allow KCC to sell the Washington-Baltimore region to a single

---

[4] The parties and their citations are a little unclear about when Pella told Mr. Cassidy it wanted him to sell part of KCC's business—initially when it told him it wanted the Washington and Baltimore regions split up, or a month later.  To whatever extent there is a dispute here, neither party indicates that it is a material one.

buyer.  (ECF No. 47-2, at 3).  Pella agreed and reiterated that it would continue to offer support to help KCC sell the business.

Within a month, Pella and KCC had signed a memorandum of understanding ("MOU") that set out a general framework for how the sale effort would proceed.  The MOU set out four phases: (1) KCC would engage a broker; (2) KCC and the broker would prepare a "Confidential Offering Memorandum"; (3) KCC would select buyer candidates; and (4) once Pella consented to a buyer, it would execute a purchase agreement and close the transaction.  (ECF No. 46-18, at 2).  The MOU set "targeted timeline[s]" for each phase. Phase One—June 15, 2016; Phase Two—July 15, 2016; Phase Three—December 31, 2016; and Phase Four—March 31, 2017.  Under Phase Four, the parties agreed "that their mutual rights and obligations outlined in the various distribution agreements in effect as of this date, continue in full force and effect."  (ECF No. 46-18, at 2).  Although the MOU states that it is non-binding, the parties now, as explained further below, dispute whether the MOU was binding or non-binding.

The MOU does not specify criteria for obtaining Pella's consent to a prospective purchaser.  KCC had internal discussions about whether to ask for more concrete criteria in the MOU.  (ECF Nos. 46-8, at 30-32; 46-19, at 4-6).  KCC was concerned that if Pella included strict requirements in the MOU, it could limit the value of a sale.  Thus, Mr. Cassidy reasoned, it may be worthwhile

to leave the criteria undeveloped, and then fight things out with Pella once a buyer was identified.  (ECF No. 46-19, at 4).  Mr. Maskell asserts in his declaration that he asked Pella, specifically David Smart, then Pella's CFO, for a more definitive understanding of what Pella wanted in a buyer, and suggested adding language from the Sales Branch Agreements that a buyer meet the "market" and "financial qualifications" typically considered by Pella when evaluating a news sales branch candidate, and that the candidate should be willing to assume all outstanding obligations of KCC with respect to KCC's service and warranty obligations. (ECF No. 49-2, at ¶15).  Mr. Maskell asserts that Pella refused to agree to this.  It is not clear when this conversation happened. KCC has only cited the declaration of Mr. Maskell, which does not identify when this conversation happened.

### C. The Sale Process up to Pella Rejecting Parksite

After signing the MOU, KCC hired Duff & Phelps Securities, LLC, as a broker to market and manage the sale of KCC.  Duff and Phelps first marketed KCC to potential buyers with a one-page "teaser" of information.   Then  it  prepared  a  Confidential Information Memorandum ("CIM").

Over the next several months, Duff & Phelps developed a list of potential purchasers and marketed KCC to entities it had identified as target buyers.  By the end of October 2016, three entities had submitted "Indications of Interest."  (ECF No. 49-

9).  The three entities had different preliminary valuations of KCC, ranging from $20,000,000, to $28,000,000.  (ECF No. 49-9, at 3-5).  Parksite, the company ultimately proposed by KCC as a buyer, had the highest valuation, between $26,000,000, and $28,000,000.  (ECF No. 49-9, at 3).  On October 28, 2016, Duff & Phelps sent a summary of the three indications of interest to KCC.[5]

Shortly thereafter, Accretive Company, Inc., submitted an indication of interest with a valuation of KCC at $17,400,000.  (ECF Nos. 47-7; 49-2, at ¶26).  Accretive was owned by Michael Finch, a businessman who lives in Michigan.[6]  Mr. Finch had been

---

[5] The parties dispute whether this information was shared with Pella.  Mr. Maskell says in his declaration that he "passed on" this information to Pella in a "weekly update meeting."  (ECF No. 49-2, at ¶¶21-24).  It is not clear whether he meant he passed on the identities of these parties, or just that KCC was receiving indications of interest.  At his deposition Mr. Maskell testified that he did not share the summary of the indications of interest with Pella at that time because they did not ask for it.  (ECF No. 46-15, at 29).  In any event, when Pella learned of Parksite's candidacy is immaterial.  As explained below, KCC has not established that the speed with which Pella rejected Parksite creates a genuine dispute as to reasonableness.

[6] Because Mr. Finch and Mr. Estabrook live in Michigan, KCC has referred to them as the "Michigan Group."  That is not a naming convention the two men use.  Rather, Mr. Finch, with Mr. Estabrook's support and help, initially attempted to purchase KCC in 2016 and 2017 through his company Accretive.  The exact nature of Mr. Estabrook's involvement is unclear, but he at least seems to have endorsed Mr. Finch to Pella and been actively involved in negotiating with Pella and KCC on behalf of the Accretive bid.  The two men certainly thought Mr. Estabrook's involvement in the bid would increase its chances of success.  After the Accretive bid was withdrawn, Mr. Estabrook eventually formed Pella Mid-Atlantic, which completed the purchase of KCC in 2018.

referred for ownership of a Pella franchise by John Estabrook, an existing PDSN branch owner. (ECF No. 47-8, at 2). In August and September of 2016, Pella had evaluated Michael Finch as a candidate for becoming an owner of a Pella franchise. He was first evaluated using "Talent+," a psychological evaluation tool used by Pella to evaluate potential PDSN owners. The overall result of the evaluation was "Not Recommended to move forward in the selection process." (ECF No. 50-2, at 3). Two metrics of the evaluation brought down Mr. Finch's overall score—Individualized Approach and Growth Orientation. Pella discussed these areas with Mr. Finch and Mr. Estabrook, and, when Mr. Finch was interviewed, specifically targeted these areas for "prob[ing]" during the interview. (ECF No. 47-8, at 2). By the end of the evaluation process, Annette Bravard thought Mr. Finch was a good candidate in his own right, and because he would be working with John Estabrook, a known commodity to Pella. Ms. Bravard believed that Mr. Estabrook would support Mr. Finch, because he would not want his "first candidate"—Mr. Finch—to fail. (ECF No. 50-3, at 2). Pella qualified Mr. Finch for ownership of a PDSN, although not for a specific PDSN. Instead, Pella constantly vetted potential ownership candidates as it became aware of them so that it could maintain a stable of ownership candidates should a need for one arise. (ECF No. 46-6, at 18).

In early November, Pella shared Mr. Finch's name with KCC as a buyer that KCC may want to consider.  Pella explained that it had already qualified Mr. Finch for PDSN ownership and was someone it liked.  Pella reassured KCC, however, that there was no pressure to pick Mr. Finch, and that it understood KCC might go in a different direction.  (ECF No. 47-10, at 2).  On November 10, 2016, Duff & Phelps shared the CIM for the attempted sale of KCC's business with Accretive.[7]  (ECF No. 50-4).

On November 18, 2016, Mr. Finch emailed Mr. Estabrook regarding edits to a "non-binding indication of interest" the two were preparing.  (ECF No. 50-5, at 2).  This seems to have been on behalf of Accretive.  Among the factors the two believed made the Accretive proposal attractive was Mr. Estabrook's experience as a Pella Branch owner/operator, their ability to increase market share and penetrate untapped markets, and that the buyer (Mr. Finch) was pre-approved by Pella.  Of the various reasons, the last one, pre-approval, was "the big one!"  (ECF No. 50-5, at 2).  As stated above, the Accretive letter of intent was submitted in November 2016, which brought the total number of "interested parties" KCC was considering to four.  (ECF No. 49-2, at ¶26).

---

[7] KCC says that the CIM was shared at the "insistence" of Pella, but it only cites an email in which Duff & Phelps sent the CIM to John Estabrook without any reference to any insistence by Pella.  (ECF No. 50-4, at 2).

On December 13, 2016, Pella reached out to Charlie Maskell by email.  It reminded Mr. Maskell that, under the MOU, KCC was to submit prospective buyers to Pella by December 31, 2016.  (ECF No. 50-6, at 2).  Pella mentioned that Mr. Finch and Accretive were interested in moving forward.  Pella inquired "how things were shaping up with other candidates potentially already in the pipeline[,]" and reminded Mr. Maskell that Pella would need to approve of "eventual front-runners" and that it was still "very interested in the owner/operator model in terms of these businesses." (*Id.*)  Mr. Maskell responded by email, explaining that the process was going well with evaluating prospective buyers, and that KCC had "at least four very credible buyers[.]" (*Id.*).  He then said that "[w]e have a deadline of January 11th for firm offers with a requirement to close by March 31, 2017." KCC planned during the final weeks of January to review specifics with Pella, "understanding any buyer must receive" Pella's approval.  (*Id.*).  Out of this email exchange a meeting was scheduled between Pella and KCC for January 11, 2017.  (ECF No. 49-2, at ¶27).

Mr. Maskell states that by the time of the January 11, 2017, meeting, two of the prospective buyers had "dropped out," and that KCC had only one prospective buyer at that time which it wanted to present to Pella.  (ECF No. 49-2, at ¶30).  Mr. Maskell neglected to mention these dropouts in his January 24 email proposing Parksite, only mentioning that KCC had received four offers.  (ECF

No. 46-25, at 3).  It does not seem that Mr. Maskell told Pella about the dropouts at the January 11 meeting.  In Mr. Maskell's words, Pella "pushed" KCC to "present" a second candidate, and asked if Accretive had been given access to the KCC data room. (ECF No. 49-2, at ¶¶29-31).

The next day, January 12, Parksite submitted to KCC a non-binding letter of intent, offering to pay $27,000,000, for KCC. (ECF No. 47-15).  Parksite revised its offer to $29,000,000 after pressure from Duff & Phelps.

**D. Pella Rejects Parksite**

On January 24, 2017, at 8:28 PM, Charlie Maskell emailed Annette Bravard, Pella's VP of Sales, and David Smart.  (ECF No. 46-25, at 2).  In this email, Mr. Maskell explained that, through the marketing of KCC by Duff & Phelps, four parties had emerged as possible buyers.  (ECF No. 46-25, at 3).  Of the four prospective buyers, Parksite had emerged as the "most motivated and best bidder . . . categorically superior in all respects."  KCC was submitting Parksite to Pella for consideration as the buyer of KCC.  Mr. Maskell explained that Parksite was employee-owned and headquartered in Batavia, Illinois; operated out of nine distribution centers throughout the Midwest and eastern United States; had two existing locations in Baltimore; and had built "relationships with high-quality manufacturers like Pella.  The most recognized of Parksite's longstanding relationship[s] is with

DuPont and with DuPont's well-known Tyvek product." (ECF No. 46-25, at 3). Mr. Maskell proposed having Parksite and Pella officers meet in Miami.

At 9:17 PM, Annette Bravard forwarded the email proposing Parksite to Paul Parks, then Pella's Vice President of Sales Subsidiaries. (ECF No. 49-17, at 1) (Plaintiff's Opposition Ex. 13). She wrote above the forwarded email: "Read through this and let's catch up in the morning. I don't know this firm but I'm sure you do. We do not want them at Miami."

At 9:26 PM, Annette Bravard sent an email to David Smart and Paul Parks with a subject line of "Beltsville candidate sells competitive products in MN" and a URL to the Parksite website with a story about Parksite selling Therma Tru Doors, a non-Pella product, in Minnesota. (ECF No. 46-41, at 2).

At 9:29 PM, Annette Bravard sent an email to David Smart and Paul Parks with a subject line of "Parksite location" and a URL to the Parksite website. (ECF No. 46-42, at 2).

At 10:21 PM, David Smart replied to Annette Bravard's "Parksite location email," stating that they had discussed with "Charlie" on multiple occasions that the Pella model was for buyer-owner-operators. He asked Ms. Bravard to have another Pella

employee "pull out the formal communications on this topic with Charlie and Beltsville."[8]  (ECF No. 50-8, at 2-3).

At 5:23 AM on January 25, Ms. Bravard replied to Mr. Smart and Mr. Parks, agreeing that they had "discussed owner operator multiple times and no way does this fit our model.  We also offered him a highly qualified candidate he rejected."  She asked Mr. Parks to "rally" other Pella employees "today for a response."  (ECF No. 50-8, at 2).

At 7:02 AM, Mr. Parks responded that he would do as Ms. Bravard had asked.  (ECF No. 50-8, at 2).

At 5:44 PM on January 25, Annette Bravard replied to Charlie Maskell's email proposing Parksite, asking to discuss the proposal with him the next day.  (ECF No. 46-25, at 2).

At some point in this timeline, although it is not entirely clear when, Mr. Parks completed a review of Parksite as a prospective buyer of KCC's business.  He recalls that he did an investigation into who Parksite was "within . . . a day or two" after receiving KCC's proposal.  (ECF No. 49-20, at 10) (Parks Deposition).  His research consisted of reviewing Parksite's website.  (*Id.* at 11).  Mr. Parks recalls reporting back to Ms.

---

[8] KCC repeatedly emphasizes that Ms. Bravard does not remember if she spoke with Mr. Smart that evening.  (*See, e.g.*, ECF No. 49, at 13).  It is not entirely clear how much this distinction matters, given that it is undisputed that Mr. Smart responded to Ms. Bravard's email on the evening of January 24, and that the two began communicating again early the next morning.

Bravard that Parksite "was a distributor of multi-line building products that operates in Pella's pro-dealer distribution channel." (*Id.* at 12). In Mr. Parks' words, the "basis of Pella's not approving Parksite as a candidate was that Pella quickly discovered that Parksite was a multi-lined building products distributor that operated in Pella's Pro Dealer distribution channel. It was not a match for the PDSN channel." (ECF No. 46-43, at 8). He recommended to her that Parksite did not fit the profile of a PDSN owner. She took that recommendation under advisement and continued discussing the proposal with Mr. Smart, and then they took the recommendation to Tim Yaggi, Pella's CEO. (ECF No. 49-20, at 16).

On January 26, 2017, at 10:47 AM, Mr. Parks emailed Annette Bravard with "some thoughts on how our direct model is intended to work, our current ownership structures and why Parksite doesn't fit our model." (ECF No 47-18, at 2). Paul Parks identified four problems with Parksite: it (1) would "have focuses beyond just Pella with the building materials category"; (2) had a two-step business inconsistent with Pella's direct to market model; (3) was nationally focused; and (4) conflicted with Pella's channel strategy of Direct vs. National Accounts Pro Dealers.[9] (ECF No. 47-18, at 2).

_____

[9] A two-step business model is one in which a seller acquires merchandise from a manufacturer, and then sells it to another

On January 26, 2017, at 2:51 PM, Annette Bravard sent an email to David Smart and Paul Parks with an attachment summarizing the phone call that the three of them had had with Charlie Maskell earlier that day.  The attachment recites the objections from Mr. Maskell to Pella's rejection of Parksite, and responses from the Pella officers to the objections.  The officers told Mr. Maskell that Parksite did not fit Pella's model for a PDSN owner/operator. (ECF No. 47-19, at 3).  The officers explained that an owner/operator needed to have vested/monetary interest in achieving market share growth.  (*Id.*).  The Parksite business model of being an employee-owned business, which made employees owners of a national business, was not the owner/operator model.  (*Id.*). The officers also explained that while Pella understood that KCC liked the Parksite offer, unfortunately the Parksite model did not align with Pella's PDSN model, which was what Pella cared about protecting.  (*Id.* at 3-4).  Ultimately, the officers told Mr. Maskell, Pella did not see a point in further considering Parksite because Parksite did not fit Pella's model, Pella wanted to meet the March 31, 2017, deadline in the MOU, and KCC had indicated it had other prospective owners—which it should bring forward for consideration.  (*Id.*).

---

seller, who then sells it to the ultimate consumer.  (*See, e.g.*, ECF No. 46-37, at 12-13).

Subsequently, David Smart and Annette Bravard sent a letter to Charlie Maskell, explaining Pella's rejection of Parksite.  The letter stated that it was their judgment that "Parksite's business model and approach to the marketplace does not align well with Pella's needs for a sales branch owner that is fully focused and committed to the Pella product line and its growth in the market." (ECF No. 47-23, at 2).  The letter further stated that Pella believed its "best chance for success in today's market is to have a distribution network consisting of owner/operators that are in-market and have an intense, personal investment not only in the sale and improved market position of Pella products, but also in the team that they put together that will sell Pella products and also manage the reputation of the Pella brand." (*Id.*).  The letter concluded by reminding Mr. Maskell that Pella had offered multiple times to assist KCC with reviewing candidates earlier in the process, and that Pella had even provided an approved candidate to enter KCC's pool to assist with the process.  Pella still expected KCC to meet the March 31, 2017, timeline articulated in the MOU. If the timeline was not met, then Pella would have no choice but to exercise its rights as outlined in the sales branch agreements, presumably to terminate KCC's distribution rights.

**E. Events After Pella Rejected Parksite**

After Pella rejected Parksite, Mr. Cassidy intervened in the sale process, and asked several times to be allowed to bring

Parksite to Pella to address Pella's concerns, but was, in Mr. Cassidy's words, "rebuffed." (ECF No. 49-1, ¶37). Specifically, on Sunday, January 29, 2017, Mr. Cassidy directly emailed Mr. Yaggi, Pella's CEO. He complained that he had been dealing in good faith with the MOU and sale process, and that the "threatening letter" was unbelievable to him. (ECF No. 49-23, at 2). Mr. Yaggi responded offering a time to talk, and saying:

> In thinking about the options you suggested on Friday, I believe our best bet is to re-engage with the buyer from Michigan. We would prefer not to own the branch ourselves, and our perspective on Parksi[t]e isn't going to change.
>
> The buyer may be willing to go higher on the multiple, and we may be able to help as well, perhaps with financing. I'll ask David Smart to be available to add his perspective on closing the gap with this buyer.

(*Id.*). Pella assisting with financing was "not common." (ECF Nos. 49-24, at 8; 49-18, at 28-29).

Later on January 29, Ms. Bravard, who had been sent the above email exchange between Mr. Yaggi and Mr. Cassidy, emailed Mr. Yaggi. She said she was meeting with "Paul" and "Matt" the next morning, and would bring Mr. Yaggi three options. She expressed concern about discussing Pella's helping finance the purchase of KCC, because "Paul" and "Matt" may ask for the same treatment in subsequent efforts of their own to purchase branches. She also said that she was unsure she should participate in the meeting the

next day between Mr. Yaggi and Mr. Cassidy.  On the one hand, she
thought Mr. Cassidy would be happier if she did not attend.  On
the other hand, she did not want it to send the message that
owners, like Mr. Cassidy, could bypass her and her team on deals
like this one.  She concluded by saying "[w]e are on the tip of
the spear executing the agreed upon plan including sending the
[formal rejection] letter below."  (ECF No. 49-26, at 2).

Mr. Yaggi and Mr. Cassidy spoke by phone on January 30, 2017.
In Mr. Cassidy's words, Mr. Yaggi "pushed" him to reach out to the
"Michigan Group" to see how much higher of an offer they would
make for KCC's business.  (ECF No. 49-1, at ¶51).  Mr. Cassidy did
so.

The next day, Paul Parks reported to Ms. Bravard and Mr. Smart
that he had heard from Mr. Estabrook and Mr. Finch.  The two men
had told him that Mr. Cassidy had contacted them, and suggested
they purchase KCC's Baltimore business for $8,000,000, and then
buy out the rest of KCC's business within 12-24 months for a total
price of $29,000,000.  (ECF No. 49-27, at 2).  Mr. Estabrook and
Mr. Finch told Mr. Parks that they were going to tell Mr. Cassidy
that they did not see the valuation of KCC's business at between
$25,000,000 and $29,000,000, but that they may be able to offer
more if they could study KCC's financials more.  Mr. Parks
concluded his report by stating that he expected Mr. Cassidy to
reject the Accretive offer, and that they would need to be ready

to "move accordingly with other candidates Kevin brings forward." (*Id.*).

On February 3, 2017, Mr. Cassidy again emailed Mr. Yaggi, asserting that he had a $32,000,000 valuation for KCC, a prospective buyer offering $29,000,000, and that Pella should consider permitting KCC to sell just the Baltimore business to Accretive or reengage with another prospective buyer, Mr. O'Toole. (ECF No. 49-1, at ¶56). Mr. Yaggi responded five days later. He stated he wanted to make sure the men were clear on a number of items raised in Mr. Cassidy's email, before they met later that day. (ECF No. 50-10, at 2). His five points were:

> 1. While we will continue to try to identify potential candidates to buy your business, we want to make it clear that we do not intend to be part of the sale process, and it is not our responsibility to find a buyer for you. We did provide you with one potential candidate to whom we would be willing to provide a Pella Dealer Agreement. We are open to other candidates that you identify, but will exercise our right to offer a Pella Dealer Agreement only to a person we believe is appropriate for our model. To help move the process along more efficiently, we ask you include us much earlier in the vetting process. If we believe it is in our best interests to do so, we may well step in and provide assistance to help close a deal, but we are not at a point where we are prepared to make that decision.
>
> 2. Regarding the warehouse and your other businesses, except as they impact the potential candidate's ability to be an effective Pella Dealer, those issues are between you and any potential buyer.

3.  You  have  mentioned  Patrick  O'Toole's
potential  involvement.   We  are  not  willing  to
offer  a  Pella  Dealer  Agreement  to  him  for  this
territory.    It  is  not  consistent  with  our
distribution  strategy.

4. We want to assist you in moving this process
forward so we may consider contacting Parksite
directly to urge them to waive the exclusivity
provision,  but  we  will  not  entertain  the
discussion  of  them  becoming  a  potential  Pella
sales  branch  owner.   I  have  also  spoken  with
David  and  he  does  not  recall  ever  agreeing
with Charlie about an exclusivity period for
Parksite, and it certainly was not covered in
our  MOU.   We  always  believed  that  early
vetting  of  a  potential  Pella  Distribution
owner was the best approach.

5. With  regard  to  KC  South  we  are  naturally
interested  in  any  thoughts  you  may  have.   As
we have tried to emphasize in this process, we
are  available  to  help  vet  and  discuss  any
potential  candidate  [with]  potential  to  be  a
Pella  Distributor  at  any  time,  so  please  feel
[free]  to  contact  David  or  Matt  to  discuss.

(ECF No. 50-10, at 2).

At  some  point  after  this,  Mr.  Cassidy  communicated  to  Mr.
Yaggi  that  a  group  of  KCC  employees  was  interested  in  purchasing
KCC  for  $25,000,000.   (ECF No. 49-1, at ¶59).   Mr.  Yaggi  responded
to  this  idea  on  February  9,  2017,  in  an  email.   He  explained  that
Pella  was  open  to  a  sale  to  two  of  the  three  employees  Mr.  Cassidy
had  mentioned.   He  went  on  to  say,  however,  that  an  issue  which
would  need  to  be  resolved  was  the  structure  of  the  business.   The
owners  would  need  to  be  independent  operators  and  not  have  multiple
owners  for  the  same  business.   Pella  had  found  it  to  be  an  untenable

business model where there was not one clear leader and accountable decision maker.  (ECF No. 49-29, at 3).  Mr. Yaggi also said the type of split needed to be confirmed, with Pella preferring a geographic split.  Mr. Yaggi also said that Pella believed the "candidate from Michigan" should view the data room and consider whether to raise his offer, or purchase a portion of KCC in a split.  (*Id.*).  Mr. Yaggi concluded by saying that Pella was open to further discussion, "particularly concerning the sale to your managers."  (*Id.*)

At some point after this, Mr. Estabrook spoke with Mr. Cassidy and confirmed that Accretive would look at raising its offer and confirmed that Pella had offered to help finance the purchase. (ECF No. 49-1, at ¶62).

On February 14, 2017, Ronald Heitzman, Parksite's CEO, called Pella to speak with Mr. Yaggi.  He was referred instead to Mr. Smart.  (ECF No. 49-21, at 25-26).  Mr. Heitzman and Mr. Smart had a "very brief cordial conversation" about Parksite.  Mr. Heitzman did not attempt to convince Mr. Smart that Pella should reconsider its rejection of Parksite as a purchaser of KCC.  (*Id.* at 26).[10]

---

[10] KCC asserts in its opposition that Mr. Heitzman tried to speak with Mr. Yaggi about why Parksite was rejected, but that Mr. Yaggi "refused to take" Mr. Heitzman's call.  (ECF No. 49, at 18). KCC only cites the deposition testimony of Mr. Smart for this assertion.  Mr. Smart's deposition testimony merely states that Mr. Heitzman was "referred" to Mr. Smart.  It does not state that Mr. Yaggi refused to speak with Mr. Heitzman.

Pella then began evaluating the KCC managers who had offered to buy the business. (ECF No. 49-1, at ¶63). It appears that ultimately four of KCC managers were evaluated by Parksite, but the parties do not discuss when the number under consideration went from three to four. (ECF No. 50-11, at 3). In any event, they were evaluated by the same metrics that Pella used for any prospective ownership candidate, including the Talent+ examination which had been used to evaluate Mr. Finch in the fall of 2016. (ECF No. 49-1, at ¶64). By March 23, 2017, the Talent+ evaluation of three of the KCC managers had been completed and a fourth was still being prepared. None of the three candidates earned a passing score. (ECF No. 50-11, at 3). Ms. Bravard forwarded the results to David Smart. In her email she also discussed a conversation she had had with "Tim" (presumably Mr. Yaggi) who was uncomfortable with consenting to KCC selling the entirety of its business to the KCC employees, but was more comfortable with "Finch" buying one market and the employees another, so that Pella could attain its desired split of the Washington and Baltimore markets. (*Id.*). Ms. Bravard also reported that Mr. Yaggi believed they needed to get the KCC employee candidates "to Pella and educate them about how much they should be paying for this and their offer shouldn't be any better than Finch's." (*Id.*). She concluded the email by saying "Signing off to go grab lunch and cheer for Michigan."

26

On March 24, 2017, Mr. Finch and Mr. Estabrook notified Pella that they were meeting with KCC on April 7, 2017. (ECF No. 49-31, at 2).

On April 6, 2017, Mr. Cassidy emailed Mr. Yaggi and Adam Farver, asking to speak with them. (ECF No. 50-12, at 2). He complained that he felt "railroaded," that all four of his managers had been rejected by Pella as prospective owners, and that Annette Bravard had described them as "harvesters." (*Id.*). Mr. Yaggi responded and explained that the KCC employee candidates had not been rejected, but that they had been assessed by Talent+, which did not recommend any of them for ownership. (*Id.*). The managers were, however, still going to be interviewed by Pella and "given a chance in the process." Lack of support from Talent+, however, made it much less likely Pella would ultimately approve them. He further explained that this information was communicated to Mr. Cassidy quickly so that he could consider it before he met with the "Michigan buyer." He was a candidate that Pella would approve. Pella was happy, however, to "see the key managers remain with the business. This is about the right fit for ownership." He reiterated that it was ultimately his decision, and that Mr. Yaggi could write Adam Farver, Pella's Chairman, but it would waste Mr. Cassidy's time and Mr. Farver's.[11]

---

[11] KCC asserts that Mr. Yaggi distanced himself from the decision to reject Parksite. (ECF No. 49, at 19). At deposition,

At some point, the KCC managers were rejected as buyers.  (ECF No. 49-1, at ¶73).

On April 19, Mr. Maskell emailed Mr. Smart asking to discuss "next steps."  (ECF No. 50-13, at 2).  This was apparently in reference to KCC moving forward with considering the Accretive interest in buying KCC.  Mr. Smart conferred with Ms. Bravard, and the two agreed that he should tell Mr. Maskell that he was going to meet with Mr. Estabrook and get his perspective, and then try to put together a proposal to review with Mr. Maskell.  (*Id.*).

Over the next few days Mr. Finch and Mr. Estabrook determined how much they would bid for KCC.  Pella offered to help finance the purchase by Accretive.  In June, it ultimately offered to finance $15,000,000.  (ECF No. 50-19, at 2).  Accretive initially offered KCC $22,000,000, but subsequently lowered the offer to $20,000,000.  This offer from Accretive, however, was withdrawn when Mr. Finch withdrew for personal reasons later in 2017.  (ECF No. 46-8, at 56).

After some time, and further inconclusive efforts to sell KCC, Mr. Estabrook came forward with an offer to buy KCC in March

---

Mr. Yaggi testified that the decision to reject the KCC managers was not his decision.  (ECF No. 49-24, at 6).  KCC seems to be taking Mr. Yaggi's words out of context.  At the deposition he was talking about the rejection of the managers, not the rejection of Parksite.

of 2018.[12]   (ECF Nos. 46-8, at 58; 47-26, at 2).   Mr. Estabrook formed Pella Mid-Atlantic ("Pella MA"), which successfully purchased KCC in August 2018.   Before consenting to the sale of KCC's distribution rights to Pella MA, Defendant Pella required Pella MA to agree to certain conditions, including Pella MA agreeing to split the Washington and Baltimore markets within four years of the sale and to bring in an additional party to act as the in-market owner-operator.   (ECF Nos. 46-55, at 8; 46-59, at 2; 47-28, at 3).[13]   As of discovery, such an owner-operator had been hired and made an equity owner of Pella MA, Greg Ballman.   The splitting up of Washington and Baltimore has still apparently not occurred.

### F. Procedural Background

KCC filed a three-claim complaint against Pella in January of 2020.   (ECF No. 1).   Pella moved to dismiss for failure to state

---

[12] This effort to buy KCC was led by Mr. Estabrook, whereas the previous effort had been led by Mr. Finch.   The ownership percentages of Pella MA were Mr. Estabrook—40% investment; Mr. Finch—20%; and a new party to the effort to purchase KCC, Greg Boulay—40%.   (ECF No. 46-55, at 6).

[13] As above in footnote 3, KCC asserts, without elaboration or explanation, hearsay and lack of foundation objections to the factual assertions related to the conditions set upon Pella MA's purchase.   (ECF No. 49-3, at ¶117-20).   Again, it is not clear what the basis for these objections are, or why individuals involved in transactions, or the documents concerning the transactions, could not be considered when, as here, Plaintiff has not asserted a factual dispute, but instead has simply asserted that it is "unknown" whether the fact is disputed.

a claim.  (ECF No. 20).  KCC then filed an amended complaint.  (ECF No. 24).  Pella moved partially to dismiss the amended complaint. (ECF No. 25).  The motion partially to dismiss was granted, and KCC's fraudulent inducement and negligent misrepresentation claims were dismissed.  Only KCC's breach of contract claim now remains. (ECF Nos. 34 and 35).  Pella then filed an answer.  (ECF No. 36). Earlier this year Pella moved for summary judgment.  (ECF No. 46).

## II.  Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *See Liberty Lobby,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

KCC's remaining claim is for breach of contract. The parties agree both that Iowa law governs, and that in light of the few relevant cases applying Iowa law they need to cite non-Iowa cases. (ECF Nos. 46-1, at 23 n.8; 49, at 22 n.1). Under Iowa law, to establish breach of contract, a Plaintiff must show (1) the

31

existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract; and (5) that plaintiff suffered damages as a result of the breach. *ContiTech USA, Inc. v. McLaughlin Freight Servs., Inc.*, Case No. 3:20-cv-00075-SMR-SBJ, 2022 WL 266166, at *14 (S.D. Iowa Jan. 6, 2022) (citation omitted) (applying Iowa law). The parties agree that the only elements in dispute are breach and damages. (ECF No. 49, at 23). As explained below, there is not a genuine dispute of material fact that Pella did not breach the Distribution Agreements. Thus, the damages arguments will not be discussed and the motion for summary judgment will be granted.

### A. Breach

The parties do not dispute that KCC needed Pella's consent to transfer its distribution rights. The parties also do not dispute that Pella was permitted to withhold that consent, and that Pella agreed that consent would not be "unreasonably withheld." Pella reserved the right to accept or reject a proposed transfer based on the factors that Pella, in the exercise of its business judgment, determined were relevant to the long-term needs and business interests of its business. The denial of consent, however, had to be based on business judgment and could not be a pretext. KCC asserts that Pella breached their agreements by (1) withholding consent unreasonably; (2) withholding consent based on

a pretext; (3) interfering in the sale process; and (4) breaching the MOU.

### 1. Pella's Reasonable Rejection of Parksite

Pella asserts that it is undisputed that reasonable grounds existed for its withholding consent from the proposed sale of distribution rights to Parksite. (ECF No. 46-1, at 24). It argues that it withheld consent because Parksite was a regional, multi-line, two-step building products distributor that sold the products of different manufacturers. (ECF No. 46-1, at 24 and 26). Pella asserts those characteristics made Parksite incompatible with the PDSN, and that selling a PDSN branch to a business with a Pro Dealer business profile would have, in Pella's judgment, created potentially damaging channel conflict. (ECF No. 46-1, at 26-27).

KCC asserts that there is a genuine dispute about whether Pella reasonably withheld consent. Specifically, KCC argues that Pella rejected Parksite without an objective evaluation and "without any semblance of due diligence or vetting[,]" which was "clearly unreasonable." (ECF No. 49, at 25 and 28). KCC asserts that the only due diligence conducted by Pella of Parksite was Ms. Bravard looking up Parksite on Google. (ECF No. 49, at 28-29). KCC also asserts that Pella has not presented any evidence that a sale of competitive goods was a basis for rejecting Parksite. (ECF No. 49, at 27).

It is a "long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal[.]" *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (cited by both parties).  The parties do not dispute that Pella could retain and define discretion to reject a proposed transfer of distribution rights through a contract.  (ECF Nos. 46-1, at 25; 49, at 26).  Rather, the parties dispute whether Pella reasonably rejected Parksite.  (ECF Nos. 49, at 26; 52, at 4).

Case law identifies a number of bases for a business to reasonably to withhold consent for a transfer or sale, such as where the transfer would result in a dilution of sales because a prospective franchisee sells products of a competitor, *Brittain v. Stroh Brewery Co.*, 991 F.2d 787 (Table), 1993 WL 128577, at *3-4 (4th Cir. 1993), the prospective purchaser is antagonistic and uncooperative, *id.*, the prospective buyer fails to meet objective criteria, *Hannon v. Exxon Co., U.S.A.*, 54 F.Supp.2d 485, 495-496 (D.Md. 1999), and the prospective buyer's business skills and financial abilities are deemed insufficient, *Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd.*, 748 F.Supp. 936, 941 (D.R.I. 1990).  The parties agree, however, that where such bases are contradicted by material evidence disputing the claim of a reasonable exercise of business judgment, the case should be submitted to the jury.  (ECF Nos. 49, at 28; 52, at 4); *see, e.g.,*

*Thompson*, 748 F.Supp. at 941-42 (finding that proposed transferee's business skills and financial ability constitute reasonable ground for withholding consent, but that contrary evidence, including internal memoranda stating that "reasons" could be found to reject purchase and inconsistencies in the objections to the prospective purchaser, created genuine issue of material fact as to whether refusal to consent to assignment was reasonable). The dispute then is whether Plaintiff has forecasted such contradictory material evidence.

KCC has either misstated or misconstrued the summary judgment record. The undisputed facts are that on January 24 and 25, Pella officers, including Annette Bravard, Paul Parks, and David Smart investigated Parksite and conferred about its suitability to take over KCC's PDSN branch. Among the issues Pella had with Parksite's candidacy was that it was not an owner-operator, that it was a distributor of multi-line buildings products, which made it a better fit for the Pro Dealer distribution channel and thus not a match for becoming a PDSN owner, that it had a national focus, and that it conflicted with Pella's channel strategy of separating PDSNs and Pro Dealers.[14] (ECF Nos. 46-43, at 8; 47-18, at 2; 49-

---

[14] KCC argues that Pella asserts that Parksite was a Pro Dealer that bundled orders, making it different from a typical PDSN, and that this theory is in direct contrast to Pella's strategy in January 2017 that stated that Pro Dealers were a "critical missing piece of the Pella market share" and that it was a myth that Pro Dealers bundled products any more than PDSNs. (ECF No. 49, at

20, at 12-13; 50-8, at 2-3).  Pella subsequently explained this to
KCC in the phone call between Ms. Bravard, Mr. Smart, and Mr.
Maskell, and in a letter, which stated that "Parksite's business
model and approach to the marketplace does not align well with
Pella's needs for a sales branch owner that is fully focused and
committed to the Pella product line and its growth in the market."
(ECF Nos. 47-19, at 3; 47-23, at 2).  The letter also explained
that Pella believed that its "best chance for success in today's
market is to have a distribution network consisting of
owner/operators that are in-market and have an intense, personal
investment not only in the sale and improved market position of
Pella products, but also in the team that they put together that
will sell Pella products and also manage the reputation of the
Pella brand."  (*Id.*).  These appear to be reasonable, objective
business judgment bases for rejecting Parksite.

---

16).  Pella asserts in its reply that this argument is based on a
misreading of a slide deck, (ECF No. 50-9, at 10) (Plaintiff
Opposition Ex. 18), and that what was really meant is that Pro
Dealers did not sell goods at a discounted rate compared to PDSNs.
(ECF No. 52, at 9-10).  The slide in dispute reads: "Pros lower
margins and bundle products all the time[.]  FALSE—while there may
be whole house package discounts at times, similar to PDSN volume
rebates, this doesn't happen very often."  (ECF No. 50-9, at 10).
The sentence is not the model of clarity, but it does seem to say,
as Pella asserts, that Pro Dealer Sellers do not do "whole house
package discounts" much more often than PDSN sellers do volume
rebates.  In any event, this fact dispute is immaterial, as Pella
also points out.  (ECF No. 52, at 10).  It is undisputed that
Pella's concern with Parksite was not that it may bundle Pella
products, but that it would not prioritize Pella's business
interests in the same way as other PDSNs.

36

KCC asserts that the notion that Pella rejected Parksite because it sold competing products is a "construct created by Pella's counsel after the fact." (ECF No. 49, at 15). This assertion is belied by the undisputed facts that Pella determined that Parksite was a "corporation who will have focuses beyond just Pella within the building materials category[,]" (ECF No. 47-18, at 2), and told KCC that it wanted PDSN owners that were "fully focused and committed to the Pella product line and its growth in the market." (ECF No. 47-23, at 2).

KCC then asserts that the competing product identified by Pella at the time of the Parksite rejection, Therma Tru Doors, were sold by KCC for many years before the Parksite rejection, because they were a "sanctioned . . . product that could be sold to fill in a 'gap' within" Pella's own product line. (ECF No. 49, at 16). KCC cites the declaration of Kevin Cassidy for this fact. Pella argues that discovery confirmed that Parksite sold different competitor brands beyond the Therma Tru Doors, (ECF No. 46-1, at 19), and that it was not required to ignore a new prospective PDSN owner's sale of a competitor's product just because KCC had previously sold the same product. Moreover, Pella asserts that Mr. Cassidy's deposition testimony contradicts his declaration, because he testified that he knew Parksite had a door line, but that he had never heard of it and assumed that Parksite would have to drop it to get the Pella door line. (ECF No. 52, at 9 n.5).

Although discovery has confirmed that Parksite sold products of Pella's competitors beyond Therma Tru, (ECF No. 46-37, at 7-9), the record is not clear whether Pella knew this at the time of the rejection.  That said, whatever dispute exists about whether KCC sold Therma Tru Doors, it is immaterial because it is undisputed that Pella's concern was that Parksite would not be sufficiently focused on selling Pella products.  The article about Parksite selling Therma Tru doors, which Ms. Bravard shared with her colleagues on January 24, 2017, states that Parksite would be marketing, fabricating, and distributing the full-line of Therma-Tru Doors in Minnesota.[15]  That is more than selling a stopgap

_____

[15] Ms. Bravard shared the article by sending an email to Mr. Smart containing the article's URL: https://www.parksite.com/parksite-expands-into-minnesota-with-therma-tru-door-offer.  The article appears to have been deleted from the Parksite website.  Navigating to that URL results in an Error 404—Page Not Found message.  Neither party included the article in their summary judgment submissions.  A copy of the article is available, however, through the internet archive Archive.org's "WayBack Machine" at: https://web.archive.org/web/20171114121035/www.parksite.com/park site-expands-into-minnesota-with-therma-tru-door-offering/ (last visited August 22, 2022).  *See Schwartz v. J.J.F. Management Services, Inc.*, No. 07-cv-1679-PJM, 2010 WL 1529241 at *1 (D.Md. Mar. 22, 2010) (granting in part and denying in part motion in limine; excluding references to WayBack Machine or reference dates provided by the WayBack Machine, but permitting Defendants to show website documents that can be authenticated by witnesses who can testify that they in fact viewed the relevant website at a particular time); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D.Fl. 2019) (taking judicial notice of webpages available through the WayBack Machine pursuant to Fed.R.Evid. 201(b)(2) and citing cases of other jurisdictions which have done the same) (cited in *S. Env't L. Ctr. v. Council on Env't Quality*, 446 F.Supp.3d 107, 113 n.6 (W.D.Va. 2020).

door, as KCC contends, and thus does not create a genuine dispute of fact regarding the reasonableness of Pella partially basing its rejection on Parksite's manufacture and sale of a competitor's products.

KCC's argument that Pella rejected Parksite without an objective evaluation or due diligence is belied by the undisputed facts.  KCC has also not presented authority for what was the minimum amount of time or assessment Pella was required to spend reviewing Parksite.  It is undisputed, however, that multiple officers of Pella identified multiple objective business reasons for its rejection of Parksite.  That they did so quickly and through the internet, rather than after lengthy evaluations and interviews, does not create a genuine dispute of material fact.  Moreover, as Pella points out in its reply, Mr. Maskell's email proposing Parksite as a buyer stated several of these objective disqualifications, such as its ownership structure and areas of operation.  (ECF Nos. 46-25, at 3; 52, at 7).

KCC then argues that it was not reasonable to reject Parksite because Parksite was better situated to operate in the Washington and Baltimore territories as a PDSN than Pella MA.  KCC presented this argument through this chart:

| Criteria: | Parksite | Pella MA |
|---|---|---|
| Local owner/operator? | Yes | No |

| Meets market qualifications? | Yes | Unknown |
|---|---|---|
| Meets financial qualifications? | Yes | No |
| Willing to assume all outstanding service and warranty obligations? | Yes | Yes |
| Promote goals in new "Pro Dealer" strategy | Yes | No |

KCC asserts that (1) Parksite was a local owner/operator because it already has existing warehouse space in Baltimore and that Pella MA was not an owner/operator because its owners do not live in Maryland; (2) Parksite met "financial qualifications" because it had funds on hand to close and that Pella MA did not because it ultimately required a loan from Pella; and (3) that Parksite's existing Pro Dealer infrastructure could have been an inroad for Pella to achieve an expansion of Pella's Pro Dealer channel.  (ECF No. 49, at 29-30).

Pella responds to this comparison by asserting (1) that it is undisputed that Parksite was not a local owner-operator, and that Pella MA is; (2) that KCC did not define "market qualifications," and in any event has not provided citation to evidence or authority for the proposition; (3) that KCC did not define "financial qualification," and that in any event it is undisputed that the Parksite offer was subject to multiple conditions and due diligence; (4) that KCC provided no support for Parksite's willingness to assume outstanding service and warranty

40

obligations; and (5) that KCC's assertion that Parksite could have promoted Pella's new Pro Dealer strategy ignores the undisputed fact that Parksite's overlap with Pella's pro-dealer channel was a "core reason" for Pella's rejection of Parksite. (ECF No. 52, at 10-11). Pella also asserts that there is no evidence that it rejected Parksite in order to choose Pella MA, and that Pella MA did not become a candidate until months later. (ECF No. 52, at 11).

Comparing a rejected transfer candidate against other accepted transfer candidates can identify a genuine dispute of material facts. *BASCO, Inc. v. Buth-Na-Bodhaige*, 198 F.3d 1053, 1058 (8th Cir. 1999). In *BASCO*, proposed owners of a franchise had been rejected because they had little retail experience, would not work in the shop full time, and had inadequate financing. *Id.* at 1056. The Eighth Circuit reversed the trial court's grant of summary judgment, holding there was a genuine dispute of material fact regarding the reasonableness of the withholding of consent, because the nonmovants had produced expert testimony showing that movant had approved prior franchise applications with lesser financial ability than nonmovant, and that approved franchisees had similarly lacked retail experience and ability to work in a store full time. *Id.* at 1058.

In this case, however, KCC's chart, and the facts it is purportedly based on, does not create a genuine issue of material

fact regarding the reasonableness of Pella's rejection of
Parksite.  First, KCC's argument regarding local owner/operators
ignores the undisputed facts that (1) Parksite was employee owned;
(2) Pella MA brough on an equity partner to be its CEO and local
operator, (ECF Nos. 46-55, at 9; 46-59, at 2); and (3) that an
owner-operator is one who invests its own capital into the
business, and thus its own financial wellbeing is closely tied to
the success of the business, (ECF No. 46-6, at 25-26).[16]  Based on
those undisputed facts, KCC is incorrect to say that the record
evinces that Parksite, but not Pella MA, was a "local
owner/operator."  Second, it is true that KCC did not define
"market qualifications" or provide citation as to why Parksite had

---

[16] KCC argues that the owner/operator requirement is not in
the Sales Branch Agreement.  (ECF No. 49, at 14).  It does not
argue that the absence means that Pella could not consider this
characteristic as part of its marketing needs, or the financial or
other qualifications, which the Sales Branch Agreements permitted
Pella to consider as part of its business judgment.

KCC also argues that Pella MA does not really have an
owner/operator with decision-making authority because Pella MA
would require unanimous consent to open a new Baltimore showroom.
(ECF No. 49, at 30 n.4).  It cites a document in which Pella MA's
owners (Mr. Estabrook, Mr. Goulay, Mr. Finch, and Mr. Ballman)
approved the lease of a property in Virginia.  (ECF No. 50-21).
Once again, KCC does not tie its argument to Pella's business
standards and explain why such unanimous consent means that it can
ignore Mr. Ballman's equity ownership and local management, or
even why the local owner/operator must have total unilateral
decision-making powers.  This argument also ignores that a
condition of Pella MA's acquisition of the KCC business was that
it would have to split up the Washington and Baltimore businesses.

them and Pella MA does not.[17]  Third, while financial ability is a
factor that can be considered while making a business judgment,
see *BASCO*, 198 F.3d at 1058, KCC has not identified any evidence
indicating that the financial ability of a prospective owner
independently to complete the purchase was a factor that Pella
considered inconsistently.  Fourth, while undisputed that Parksite
fit into the Pro Dealer channel, it is likewise undisputed that
Pella wished to keep the KCC business in the PDSN channel.  KCC
has provided no citation to law or record that makes such a
decision on the part of the Pella unreasonable.  In short, KCC's
purported comparison of Parksite and Pella MA does not create a
genuine issue of material fact as to the reasonableness of Pella's
rejection of Parksite.

Finally, Pella submitted the report of Paul W. Farris, whom
Pella retained to provide an expert opinion on "issues related to
Pella's distribution system and strategy, including whether the
proposed purchaser of the distribution rights, Parksite . . . did

---

[17]  Market qualifications, financial qualifications, and
willingness to assume all outstanding service and warranty
obligations were proposed by Charlie Maskell to Pella as factors
that should be included in the MOU as bases for Pella's evaluation
of potential buyers of KCC.  (ECF No. 49-2, at ¶15).  His
declaration states that they were taken from the language of the
Sales Branch Agreements, but the declaration does not state where
in the thirty-six-page document the factors came from.  It is not
clear if these were factors explicitly provided for by the Sales
Branch Agreement, or were Mr. Maskell's synthesis of the language
of the Sales Branch Agreements.  Thus, it is not clear how much
weight, if any, these factors should be given in this analysis.

or did not fit well with this strategy."   (ECF No. 47, at ¶4).
Mr. Farris concluded that Parksite's business structure was
inconsistent with Pella's PDSN distribution channel for four
reasons:

> (1) Pella's PDSNs are an extension of the
> Pella brand, promoting Pella products, trained
> as experts, and providing a consistent
> customer experience across their locations.
> Parksite, however, viewed KCC's culture,
> product mix, market position, and geographic
> presence as complementary to Parksite's
> business;
>
> (2) Parksite has approximately 20 locations
> across the country which carried a mix of
> building supply materials from several
> different brands.  That business structure was
> inconsistent with the PDSN model and was
> better suited to a Pro Dealer channel.  Not
> only was the PDSN channel supposed to promote
> a deep knowledge and focus on Pella's product
> and services, but putting a Pro Dealer
> distributor in the PDSN channel could cause
> conflict with other Pro Dealers and PDSNs;
>
> (3) Parksite is a fully employee-owned
> structure with a stock ownership plan in which
> all employees are associate owners of the
> company.  There are over 650 employee-owners.
> Pella's PDSN distribution channel, however,
> was supposed to have owner-operator entities
> whose ownership had "skin in the game."  With
> hundreds of employee-owners, Parksite lacked
> individual accountability that was considered
> important to the success of the PDSN; and
>
> (4) Parksite's proposal for purchase of KCC's
> assets states that Parksite was committed to
> building its business and increasing
> shareholder value for its associates.  By
> entering a relationship with Parksite, Pella
> would be opening itself to additional channel
> conflict whereby Parksite would be working to

> promote Parksite shareholder value, perhaps at the expense of Pella's interests.  This would have been contrary to Pella's work to align and focus the interest of PDSN distributors with Pella's products, services, and interests.

(ECF No. 47, at ¶¶57-60) (paraphrasing).  KCC does not appear to have opposed this report with evidence or an expert of its own.  For all the foregoing reasons, KCC has failed to generate a genuine dispute of material fact on the reasonableness of Pella's rejection of Parksite.

## 2. Whether Pella's Rejection of Parksite were Pretextual

KCC's theory at this stage of the litigation for why Pella's reasons for rejecting Parksite are pretexts is that Pella always wanted to transfer KCC's business to Mr. Estabrook and at a certain price.  (ECF No. 49, at 23).  Thus, the stated business reasons for rejecting Parksite were merely pretexts for executing this scheme.  KCC's theory in its amended complaint had been vaguer: that Pella really rejected Parksite because it wanted to replace KCC with an owner of its choosing. [18]  (ECF No. 24, at ¶¶16 and 72).  KCC asserts that it has generated a genuine dispute as to

---

[18] Pella argues that if it had just wanted to get rid of KCC then it could have terminated the agreements with a year's notice. (ECF No. 46-1, at 29).  KCC responds that this argument does not hold water, because the Agreements contained a non-compete clause and termination would have had worse consequences for Pella than KCC.  This disagreement does not need to be resolved because, as explained, there is not a genuine dispute of material fact regarding the reasonableness or pretextual nature of Pella's rejection of Parksite.

Pella's intentions.  (ECF No. 49, at 6).[19]  KCC supports this theory essentially by citing to every time a Pella officer mentioned Mr. Finch, Mr. Estabrook, or Accretive.  (ECF No. 49, at 31-34).

Pella asserts that KCC's allegation that Pella forced the sale of KCC so that it could install a replacement owner of its choosing is not supported with evidence in the summary judgment record.  (ECF No. 46-1, at 28).  Moreover, Pella asserts that even if Pella's stated reasons were pretext, it would not have been a breach of contract so long as Pella's pretextual reason was legitimate in exercise of its business judgment under the Distribution Agreements.  (ECF No. 46-1, at 30) (citing *Taylor Equipment, Inc. v. John Deere Co.*, 98 F.3d 1028, 1034 (8th Cir. 1996).[20]

─────────────────

[19] KCC insinuates that part of the reason Pella was only going to sell KCC to the owners of Pella MA is because Mr. Estabrook was friends with Ms. Bravard.  The basis for this argument is that (1) Mr. Cassidy gave a presentation on KCC's value in November 2015, which Mr. Estabrook attended; (2) Mr. Cassidy believed Mr. Estabrook and Ms. Bravard were friends; and (3) Mr. Estabrook, at the request of Ms. Bravard, participated in a YouTube infomercial about Pella's PDSN channel along with other PDSN owners.  (ECF No. 49-1, at ¶13-19).  Mr. Cassidy's declaration does not explain why he thinks Mr. Estabrook and Ms. Bravard were friends, or why he believes Mr. Estabrook participated in the YouTube video because of Ms. Bravard asking him.  In other words, KCC's evidence of the Estabrook-Bravard friendship is Mr. Cassidy's speculation.  Such speculation is insufficient to generate a genuine dispute of fact. *Holmes v. e.spire Communications*, 135 F.Supp.2d 657, 660 (D.Md. 2001).

[20] KCC asserts that *Taylor* is inapplicable because it is a post-trial decision.  This argument does not need to be addressed

In its reply, Pella presents seven arguments tailored to KCC's opposition.  First, it argues that KCC is wrong that Pella in August and September of 2016 was reviewing Mr. Finch for ownership of KCC's business.  (ECF No. 52, at 13).  Second, it argues that there is no evidence that Pella's Top 100 Strategy was a pretext for swapping KCC to Mr. Finch and Mr. Estabrook, because Mr. Finch was not evaluated for ownership until the fall of 2016.  (ECF No. 52, at 13-14).  Third, it argues that late-2016 emails from Pella to KCC, which KCC characterizes as showing Pella pressuring KCC to accept the Accretive offer, do not demonstrate that pressure.  (ECF No. 52, at 14-15).  Fourth, it argues that there are no internal Pella communications demonstrating that Pella was pushing for Accretive and attempting to deceive KCC in the process, as was the case in *Thompson*.  (ECF No. 52, at 14-15).  Fifth, it argues that the emails from Pella officers to KCC officers suggesting KCC re-engage with Accretive do not generate a genuine dispute about the rejection being pretext.  (ECF No. 52, at 15-16).  Sixth, it argues that KCC has not shown a contemporaneous internal email showing Pella rejected Parksite and was pushing Accretive for a non-business reason.  (ECF No. 52, at 16-17).  And seventh, it argues

---

because there is not a genuine dispute that Pella's reasons for rejecting Parksite were not pretextual.  Nevertheless, as a statement of logic, if both the stated reason for a decision and the underlying pretextual reason constitute legitimate business reasons, there would be no breach.

that the change in price offered by Accretive is not evidence of pretext because KCC has not identified any communication, document, or testimony showing that the decision to offer less money had anything to do with Pella.

The evidence KCC alleges creates a genuine dispute of pretext can be divided into (1) evidence from before the rejection that creates the inference that the subsequent rejection was a pretext and (2) evidence from after the rejection that reveals, through inference, that the preceding rejection was a pretext.[21]  It is undisputed there is no "smoking gun" memo or email as there was in *Thompson*.  KCC has attempted to argue or insinuate that the "tip of the spear" and the "cheer for Michigan" emails are such smoking guns, but they do not explicitly state that the basis for the rejection was a pretext, as the memos in *Thompson* so stated. *Thompson*, 748 F.Supp. at 941-42 n.3 ("One may say that we should find 'reasons' why the Simon Levi offer should be refused.  This can be done, but I would refer you to [in-house counsel's] opinion which is that expensive litigation would be likely to follow.").

The communications between Pella and KCC before the rejection of Parksite do not create a genuine dispute of fact about pretext.

---

[21] Viewing the evidence in a single continuum does not produce a different result.  The only way reasonably to view the evidence is that Pella had identified a potential buyer that it believed was qualified, and that, after KCC failed to produce qualified prospective buyers, Pella wanted KCC to consider this remaining prospective buyer.

The emails and communications show, at best, that Pella had,
separate from the efforts to sell KCC, identified Mr. Finch as a
candidate for owning a PDSN, but not necessarily the KCC PDSN.
Pella then provided Mr. Finch's information to KCC for
consideration, alongside the other candidates KCC was considering.
It did so without pressure, recognizing that KCC might go in a
different direction.  (ECF No. 47-10, at 2).  At certain points in
the process, it inquired about the Accretive bid, the bid it knew
the most about.   The evidence does not create a reasonable
inference of pressure.   The evidence just does not create KCC's
desired inference.

    The communications between Pella and KCC after the rejection
likewise do not create a genuine dispute of fact about pretext.
Again, even taking the reasonable inferences in KCC's favor, the
emails and communications show, at best, that Pella was attempting
to help KCC find a buyer so that the sale process, which quickly
passed the agreed upon deadline in the MOU, could be concluded.
KCC asserts that the desire to meet the March 17 deadline was
pretext, because Pella has asserted that the MOU was not binding.
(ECF No. 49, at 34).  Whether the MOU was binding or not has no
impact on whether Pella genuinely wanted to complete the sale by
the deadline to which the parties had agreed.

    The summary judgment record demonstrates that Pella was not
forcing Accretive on KCC, but encouraging KCC seriously to consider

the one remaining prospective buyer.  It is noteworthy that, in the immediate aftermath of the Parksite rejection, Pella wanted to know more about all three of the other prospects KCC had, not just Accretive.  (47-19, at 3).  It quickly became apparent, however, that KCC had failed to develop any other purchaser options that met Pella's business model.  When KCC failed to produce any other purchaser candidates, and instead put forward their own managers, Pella considered these candidates—evaluating and possibly interviewing them.

As mentioned above, KCC attempts to use the above referenced emails, the "tip of the spear" email and the "cheer for Michigan" email, as smoking gun evidence.  These emails do not create a genuine issue of fact about pretext.

The "tip of the spear" email states:

> Paul, Matt, and I are meeting tomorrow at 10 AM to bring you forth 3 options– do you have time 11-1 PM to see what we feel the options will be?  If they work[], I'll try and get David too.
>
> I'm also a little cautious on how much we discuss closing the gap on the offer in front of Matt and Paul as they both potentially want to purchase other branches and they may store that away for later use.  You may be totally comfortable but wanted to remind you of their stated intentions.
>
> I also wa[]ver in my head about being in the meeting tomorrow at 4:30.  On one hand, it will make Kevin happy that it's just you and David.  On the other hand, I don't want him spreading to other owners that he can

> completely bypass me and my team on these
> deals.  He went to Adam and that's why David
> was pulled in months ago.
>
> We are on the tip of the spear executing the
> agreed upon plan including sending the
> [official rejection of Parksite] letter below.
>
> Let me know your thoughts and if we need to
> set up time with you tomorrow.

(ECF No. 49-26, at 2).

To the extent that the "tip of the spear" email refers to executing a plan, the only reasonable reading of this email is that Pella officers were executing the plan to reject Parksite for its incompatibility with the PDSN channel and to continue trying to help KCC find a buyer, including by financing a prospective buyer.  (ECF No. 49-26, at 2).  This email simply does not support the inference that the "plan" was pretextually to reject Parksite. KCC is relying on unsupported conjecture to insinuate that "plan" referred to a pretextual rejection.  It cannot.  *Holmes*, 135 F.Supp.2d at 660.

Similarly, the "cheer for Michigan" email does not generate an issue of fact.  There are two parts of this email.  First, the assertion that Pella needed to get KCC's managers into Pella to "educate" them on how much to spend for the branch.  Second, Ms. Bravard's statement about cheering for Michigan.  The email states:

> Talent Plus topline on three of the
> candidates.  We are scheduling the deeper
> analysis feedback on these 3 plus Tim Allen
> next week.

51

> I gave Tim [Yaggi] an update and he is not
> comfortable with the internal candidate
> approach so I'm hopeful they can get on the
> same page with a face-to-face.  I threw out
> the combined option of Finch for one market
> and employees for the other market to attain
> our market split.  He was more comfortable
> with this as a de-risking strategy.  In his
> mind, we need to get these candidates to Pella
> and educate them about how much they should be
> paying for this and their offer shouldn't be
> any better than Finch's.  I'd love your
> thoughts on this . . .
>
> Signing off to go grab lunch and cheer for
> Michigan!

(ECF No. 50-11, at 2).

The undisputed context is that there was a proposal for the
KCC managers to purchase one of the Washington or Baltimore markets
and Finch (Accretive) to buy the other market.  (ECF No. 50-11, at
2).  Mr. Yaggi, whose feelings Ms. Bravard was summarizing at this
point of the email, was more comfortable with this outcome because
it ensured Pella would get the market split it wanted.  In that
context, Mr. Yaggi was expressing that the managers needed to be
educated on the amount to spend on only **one** of the markets.  If
the managers overpaid for one of the markets at the discussed price
of $25,000,000, then one of two things reasonably could have
happened: (1) KCC would try to sell its entire business to the
managers, sacrificing the desired market split; or (2) the
managers' branch would be saddled with more debt than their market
could support.  In any event, this statement does not support as

a reasonable inference that the months ago rejection of Parksite was a pretext.  The very fact that the email contemplates a sale to parties KCC wanted to sell to, and not totally selling KCC's business to the purportedly preferred Accretive, belies the reasonableness of KCC's conjecture.

Similarly, even when the "cheer for Michigan" portion of the email is read in the light most favorable to KCC, it is impossible to ignore that Ms. Bravard refers to the Accretive bid as "Finch," but then says she is going to cheer for Michigan at lunch.  First, this use of different names suggests that she was referring to different entities.  Second, as Pella asserts, Ms. Bravard was emailing David Smart, a University of Michigan alumnus, on the same day the University of Michigan's men's basketball team was playing in the "Sweet 16" of the NCAA basketball tournament.  (ECF No. 52, at 16 n.11); ESPN, https://www.espn.com/mens-college-basketball/game/_/gameId/400947325 (last visited August 21, 2022).  Judicial notice can be taken of the fact that the University of Michigan's men's basketball team played a game on March 23, 2017.  Fed.R.Evid. 201(b)(2).  Lastly, even if Ms. Bravard was cheering for KCC to accept the Accretive offer, that she was doing so two months after the Parksite rejection, and days before the MOU's deadline, makes it far too attenuated reasonably to infer that the stated reasonable reasons for rejecting Parksite in January were pretext.

KCC has failed to generate a genuine dispute about its original theory, that Pella orchestrated the sale of KCC because it wanted to handpick a new owner, as well as its theory that Pella was only ever going to select the owners of Pella MA.  For the same reasons discussed above, the timeline of events makes these theories factually impossible, and they are unsupported by evidence or reasonable inferences.

Lastly, KCC has not cited evidence in the summary judgment record to support its assertion that Pella caused Accretive to lower its bid.  It only cites the speculation of Mr. Cassidy that Accretive discussed its offer with Pella and then offered the lower bid in its letter of intent.  (ECF No. 49-1, at ¶85).  In fact, the undisputed testimony of Mr. Finch is that the offer ended up being lower because "of other pieces and parts of securitization and guarantees, behind the scenes, equity being put in, all these moving parts."  (ECF No. 52-3, at 17-18).

There is not a genuine dispute that Pella's stated reasons for rejecting Parksite were not pretext.

### 3. Interference with Sale Process

KCC's Amended Complaint also alleges that Pella breached the Agreements between the parties by interfering in the sales process, and thus breaching the implied covenant of good faith and fair dealing.  (ECF No. 24, at ¶¶64 and 65).  Pella asserts in its motion for summary judgment that there is no evidence that Pella

54

interfered in the sales process.  (ECF No. 46-1, at 30).  Pella
also asserts that under Iowa law the implied duty of good faith
and fair dealing does not impose obligations independent of the
operative contract, but that the duty operates on an express term
of the contract.  (ECF No. 46-1, at 30) (citing *Am. Tower, L.P. v.
Local Tv Iowa, L.L.C.*, 809 N.W.2d 546, 500 (Iowa 2011)).  KCC has
not, Pella says, identified such an express provision.  (ECF No.
46-1, at 30).

    KCC identifies two instances of alleged interference: (1)
when Pella "made certain that the Michigan Group offered $2 million
less than it was prepared to offer KCC in April 2017"; and (2)
when Mr. Yaggi instructed Ms. Bravard to get the KCC managers
offering to purchase KCC for $25,000,000, in to Pella to teach
them how much they should pay for the PDSN.  (ECF No. 49, at 34-
35).  KCC does not directly address Pella's argument that under
Iowa law the implied duty of good faith only operates on an express
term.  It only asserts that breach of the covenant of good faith
and fair dealing is a recognized cause of action in Iowa and that
Pella's interference in the sale interfered with Plaintiff's
contractual right to transfer the business, depriving KCC of the
benefit of its bargain.  (ECF No. 49, at 35).

    As discussed above, KCC has not generated a genuine issue of
fact regarding the change in value of the bid offered by Accretive.
As for the email regarding the managers, as Pella asserts

elsewhere, there is no evidence in the record that Pella ever had such a conversation with the managers.  (ECF No. 52, at 16).

### 4. Breach of the MOU

KCC's Amended Complaint also alleges that the MOU was binding, and that Pella breached it.  (ECF No. 24, at ¶61).  Pella asserts that the terms of the MOU expressly state that it is a "non-binding transition memorandum."  (ECF No. 46-1, at 31).  Pella also asserts that whether the MOU is binding is immaterial to resolving KCC's breach of contract claim because the MOU stated that the rights and obligations of the Distribution Agreements remained in full force and effect, and because the express terms of the MOU do not purport to add any additional obligations to Pella's rights to approve any prospective branch owner.  (ECF No. 46-1, at 31).

KCC responds that Pella's threat that it would terminate the Distribution Agreements forced KCC to abide by the MOU and hire Duff & Phelps.  (ECF No. 49, at 35).  As a result, KCC was forced to pay the costs of hiring Duff & Phelps, and other expenses, which it would have avoided if "Pella simply indicated that it would only approve a sale of KCC to the Michigan Group from the start." (ECF No. 49, at 35).  KCC further asserts that there is no doubt that the MOU was essentially an amendment to the Sales Branch Agreements, and so a finding of a breach (apparently of the Sales Branch Agreements) would include any costs incurred by KCC in accordance with the MOU.  Finally, KCC cites to Ms. Bravard's

deposition testimony, where she stated she believed the MOU to be a binding agreement.  (ECF No. 49, at 35-36).

Pella argues in its reply that KCC's argument that it is entitled to recover the fee it paid to Duff & Phelps "is really an attempt to resuscitate KCC's dismissed claims for fraudulent inducement."  Pella also points out that KCC cites no authority for the proposition that the MOU is a binding agreement, and that Bravard's belief it was does not change that.  (ECF No. 52, at 18).  Pella next argues that the whether the MOU is binding or not is immaterial, because the court has previously recognized that the MOU simply reinforced the parties' obligations in the Distribution Agreements.  (ECF No. 52, at 18).  Finally, Pella argues that KCC's argument that Pella breached the MOU by tricking KCC into hiring Duff & Phelps also fails for the same reasons the pretext argument fails: KCC identified no evidence that Pella entered the MOU process with an intent to deceive KCC.

Pella's last argument is correct.  Even if the MOU was binding, and even if that issue was material, KCC's theory remains that Pella did not act in good faith when forming the MOU, because it always intended to force KCC to sell to the Pella MA owners. As discussed above, the undisputed facts show that the Pella MA owners were not considered for any type of PDSN ownership until the fall of 2016.  KCC has not generated a genuine dispute of fact on this issue.

57

**B. Damages**

Because the motion for summary judgment will be granted on the issue of breach, the damages arguments will not be addressed.

**IV. Motions to Seal**

Both parties moved to seal exhibits attached to their memoranda related to Pella's motion for summary judgment.  (ECF Nos. 48 and 51).  The exhibits that the parties seek to seal were designated confidential in discovery pursuant to the provisions of the Stipulated Confidentiality Order.  The documents contain sensitive commercial information and confidential details about the internal operations of one or more private businesses.  The motions will be granted.

**V. Conclusion**

For the foregoing reasons, Defendant Pella Corporation's motion for summary judgment will be granted.  There is no genuine dispute of material fact on the necessary issue of breach.  Pella is entitled to the entry of judgment.  The two motions to seal will also be granted.

```
                                  /s/
                       _____
                       DEBORAH K. CHASANOW
                       United States District Judge
```